

Receipt Number
*552078*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA, ex rel,
RICHARD CHESBROUGH, M.D., and
KIM CHESBROUGH

      Plaintiffs-Co-Relators,

vs.

UNIVERSAL IMAGING, INC., a Michigan
Corporation, PHILLIP J. YOUNG, MARK
LAUHOFF, Jointly and Severally,

      Defendants.

Case: 5:06-cv-15638
Assigned To: O'Meara, John Corbett
Referral Judge: Morgan, Virginia M
Filed: 12-19-2006 At 09:56 AM
CMP USA V. UNIVERSAL IMAGING (POSSI
BLE SEALED MATTER) (JTC)

PATRICIA A. STAMLER (P35905)
SOMMERS SCHWARTZ, P.C.
Attorneys for Plaintiffs-Relators
2000 Town Center, Suite 900
Southfield, MI 48075
248-355-0300
pstamler@sommerspc.com

F I L E D
DEC 1 9 2006
CLERK'S OFFICE
U.S. DISTRICT COURT
ANN ARBOR, MI

*LAW OFFICES*
*SOMMERS SCHWARTZ, P.C.*
*2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300*

## COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT (QUI TAM), STARK ACT AND ANTI-KICKBACK STATUTE AND DEMAND FOR JURY TRIAL

Plaintiffs/Co-Relators, Richard Chesbrough and Kim Chesbrough (hereafter referred to as "Co-Relators"), on behalf of the United States of America, by and through their attorneys, SOMMERS SCHWARTZ, P.C., hereby file their Complaint under the False Claims Act, 21 U.S.C. §3729 et seq, under the Anti-Kickback Statute, 42 U.S.C. §1320A-7 et seq and the Stark Act, 42 U.S.C. §1395NN et seq, and state as follows:

### PARTIES

1.      Co-Relator Richard Chesbrough, M.D., is a citizen and resident of the State of Michigan, United States of America and brings this action on behalf of the United States of America.

2.      Co-Relator Kim Chesbrough is a citizen and resident of the State of Michigan, United States of America and brings this action on behalf of the United States of America.

3.      Defendant Universal Imaging, Inc. (hereafter UI), is for all times relevant to this Complaint a Michigan corporation with its principal place of business in Dearborn Heights, Michigan.

4.      Defendant UI is an "independent diagnostic testing facility" (IDTF).

5.      Defendant Phillip J. Young (hereafter Young) is for all times relevant to this Complaint a co-owner of Defendant UI and is for all times relevant to this Complaint a resident of Washtenaw County, Michigan.

6.      Defendant Mark Lauhoff (hereafter Lauhoff) is for all times relevant to this Complaint a co-owner of Defendant UI and is a resident of Oakland County and the State of Michigan.

## JURISDICTION AND VENUE

7.      This is an action to recover damages and civil penalties on behalf of the United States of America, arising under the False Claims Act, 31 U.S.C. §3729 et seq which provides, inter alia, that the United States District Court shall have exclusive jurisdiction of actions brought under this Act.

8.      Pursuant to 31 U.S.C. §3732(a), "any action under 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by Section 3729 occurred."

9.      The acts complained of herein occurred in Dearborn Heights, Auburn Hills, Troy and Ypsilanti, Michigan, located within this judicial district.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

10.     Pursuant to 31 U.S.C. §3729 <u>et seq</u>, this Complaint is to be filed <u>in camera</u> and under seal and is to remain under seal for a period of at least 60 days and shall not be served on defendants until the court so orders.  Further, the government may elect to intervene and proceed with the action with the 60 day time frame after it receives both the complaint and the material evidence submitted to it.

11.     Co-Relators are the original source of the information complained of herein.

12.     This is also an action to recover damages pursuant to 42 U.S.C. §1320(a) <u>et seq</u>, commonly known as the Anti-Kickback statute.

13.     This is also an action to secure damages pursuant to the provisions of 42 U.S.C. §1395NN, commonly known as "Stark II".

14.     Jurisdiction is proper based upon 28 U.S.C. §1345 and 31 U.S.C. §3732(a).

15.     Venue is proper in this district pursuant to 28 U.S.C. §1391 and 31 U.S.C. §3732(a).

## GENERAL ALLEGATIONS

16.     In June 2004, Co-Relator Richard Chesbrough, M.D., through his company, Radiology Medical Consultants (RMC) entered into a contract with Defendant UI to provide a variety of services including, Medical Director service.

17.     On or about July 13, 2005, RMC entered into an independent contractor relationship with Defendants wherein Co-Relator Richard Chesbrough and other radiologists on RMC's staff would be providing professional radiology interpretation services, only, for Defendant UI.

18.     In July 2005, RMC, through Co-Relator Richard Chesbrough, terminated the contract with Defendant UI due to alleged breaches of contract.

19.     On or about July 13, 2005, RMC entered into a separate revised contract, wherein Co-Relator Richard Chesbrough no longer served as the Medical Director for Defendant UI.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

20.     However, despite the reality that Co-Relator Richard Chesbrough no longer served as the Medical Director for UI, Defendant UI continued to represent to the Federal Government, via its ongoing certification, that it had a Medical Director on staff.

21.     From July 13, 2005 to present, no physician within RMC performed any medical director services or any overall supervisory services for Defendant UI.

22.     From on or about July 13, 2005 until February 2006, Co-Relator Richard Chesbrough and RMC continued to perform reading services only for Defendant UI.

23.     In February 2006 Defendant UI summarily cancelled the second contract with RMC.

24.     Defendant UI cancelled the second contract with RMC because Co-Relator Richard Chesbrough, after learning that Defendants had not hired a medical director and that Defendants had been falsely representing that it had a medical director, contacted Medicare.

25.     Under Medicare law, Defendants were required to report a change in medical directorship pursuant to Medicare regulations.

26.     Defendants were required to have a Medical Director on staff pursuant to Medicare regulations.

27.     Throughout Co-Relators' contact with Defendants herein, they made many efforts to secure compliance within the organization, but to no avail.

## FRAUDULENT ACTS

I.    UNIVERSAL IMAGING WAS AND IS AN ILLEGALLY FORMED CORPORATION AND AS SUCH IS ILLEGALLY BILLING THE FEDERAL GOVERNMENT

28.     Defendant UI was incorporated as a domestic-for-profit corporation on July 7, 1993 for the purpose of providing medical services.

29.     UI performs a variety of medical services, including diagnostic x-ray, ultrasound, MRI and CT scan services.

4

30.     Defendant's staff also performs injections of contrast agents, which can be potentially lethal procedures.

31.     Defendant UI's staff works with dangerous ionizing radiation and prescribes medications to patients at its various out-patient facilities.

32.     Defendant UI's activities fall within the scope of the practice of medicine in the State of Michigan.

33.     Pursuant to the Professional Service Corporation Act (PSCA), the State of Michigan requires that only licensed physicians own and operate a business that provides medical services. In addition, the PSCA forbids for profit companies, owned by non-licensed individuals, from engaging in medial practice and performing medical services.

34.     Neither Defendants Young nor Lauhoff are licensed persons within the meaning of the PSCA.

35.     The State of Michigan issues certificates of need (CON), to duly authorized corporations in order to allow such corporations to obtain critical equipment such as CT scanners and MRI machines.

36.     Defendant UI, by and through its owners, Defendants Young and Lauhoff, fraudulently obtained a CON to operate a business solely for the purpose of providing medical services for generating profit revenues.

37.     Pursuant to the Federal Medicare Regulations, 42 C.F.R. §410.33, governing IDTFs states that "carriers will pay for diagnostic procedures under the physician fee schedule only when performed by . . . an independent diagnostic testing facility . . . an IDTF may be . . . an **individual non-physician practitioner**."

38.     However, in order for an IDTF to recover fees for diagnostic tests, IDTFs must comply with the following requirements:

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

(b)(1) An IDTF must have one or more supervising physicians who are responsible for the direct and ongoing oversight of the quality of the testing performed, the proper calibration of the equipment used to perform tests, and the qualification of nonphysician personnel who use the equipment.  This level of supervision is required for general supervision set forth in § 410.32(b)(3)(i).

(2) The supervising physician must evidence proficiency in the performance and interpretation of each type of diagnostic procedure performed by the IDTF.  The proficiency may be documented by certification in specific medical specialties or subspecialties or by criteria established by the carrier for the service area in which the IDTF is located.  In the case of a procedure requiring personal supervision of a physician as set forth in § 410.32(b)(3)(ii) or (b)(3)(iii), the IDTF's supervising physician must personally furnish this level of supervision whether the procedure is performed in the IDTF or, in the case of mobile services, at the remote location.  The IDTF must maintain documentation of sufficient physician resources during all hours of operations to assure that the required physician supervision is furnished.  In the case of procedures requiring direct supervision, the supervising physician may oversee concurrent procedures.          . . . .

(d) Ordering of tests.  All procedures performed by the IDTF must be specifically ordered in writing by the physician who is treating the beneficiary, that is, the physician who is treating a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem.
          . . . .
(f) Applicability of State law.  An IDTF must comply with the applicable laws of the state in which it operates.

39.    Thus, in order for an IDTF to be legally operational, it must conform to state law.

40.    Accordingly, Defendant UI as an IDTF operating in Michigan must comply with its laws governing corporations.

41.    Defendant UI was and is an IDTF that goes beyond testing and offers actual diagnoses, and as such must be incorporated as a professional corporation or as a non-profit corporation.

42.    Defendant UI as described above did not comply with the applicable laws of the State of Michigan.

43.    Under Michigan law, Defendant UI was a for-profit corporation from 1993 to 2005, when it changed its corporate status to non-profit status, engaged in the learned profession of medical practice.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

44.   According to Michigan law, a domestic corporation formed under the Business Corporation Act may not engage in any activities which may "only be performed by one of the learned professions."

45.   Further, under Michigan law, each shareholder of a professional service corporation must themselves be a licensed professional, qualified to perform all of the professional services rendered by the corporation.

46.   Defendant Young is not a licensed professional authorized to engage in the activities which constitute the practice of medicine and diagnostic radiology.

47.   Defendant Lauhoff is not a licensed professional authorized to engage in activities which constitute the practice of medicine and diagnostic radiology.

48.   Michigan law also states that individuals are engaged in the practice of medicine if they hold themselves out to the public as a medical practitioner or medical office or if an individual uses a machine to "diagnose particular problems".

49.   Michigan law mandates that any person who holds him or herself out to the public as being engaged in the diagnosis of ailments is practicing medicine.

50.   Any individual under Michigan law who maintains an office for the examination or the treatment of persons afflicted also is engaging in the practice of medicine.

51.   Defendants UI, Young and Lauhoff have been illegally practicing medicine under the applicable laws of Michigan.

52.   Because Defendant UI is illegally operating in the State of Michigan, it has no authority to bill Medicare for services rendered.

53.   Co-Relators estimate these fraudulent claims to result in a conservative loss to the Federal Government of $3,000,000.00 per annum.

54.   On or about 1993, Defendant UI, by and through its owners, Defendants Lauhoff and Young, conspired to defraud the Federal Government by filing false incorporation documents with

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

the Michigan Corporations Bureau.  Defendants claimed that UI was incorporated for general purposes.

55.    Defendants failed to state that the main purpose of the corporation was for the purpose of providing medical services in violation of the Michigan Corporations Act and the PSCA.

56.    Defendants, subsequent to this incorporation, also falsely obtained a certificate of need from the Michigan State Department of Community Health, to openly engage in diagnostic imaging services.

57.    Defendants obtained a facility UPIN code as an independent diagnostic testing facility.

58.    Defendants refiled Defendant UI's corporate papers in 2005 and have allegedly reorganized the entity as a non-profit entity.  This reincorporation represents yet another fraudulent attempt to engage in the practice of medicine by unlicensed professionals.

59.    Defendant UI's ownership has not changed hands and, consequently, Defendants Young and Lauhoff are business professionals operating a medical practice.

60.    Further, there is no basis for Defendant UI's corporate structure to entitle it to a non-profit status.

61.    Medicare regulation 42 C.F.R. §410.33 requires that an IDTF have an overall physician supervisor or "medical director" who has the authority for overall management and supervision of the IDTF.

62.    The overall supervising physician or medical director is responsible to insure that standard safety and qualification standards are met.

63.    According to the federal regulations, and IDTF is required to have one or more overall "supervising physicians who are responsible for the direct and ongoing oversight of the quality of the testing performed, the proper operation and calibration of the equipment used to perform tests, and the qualifications of the non-physician personnel who use the equipment."

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

64.     The Medicare regulation makes it clear that the medical director must have authority over policies and procedures of the IDTF and that such authority must not be left to non-licensed individuals to manage a radiology or medical practice.

65.     During the ten month period that Co-Relator Richard Chesbrough served as Defendant UI's Medical Director and during the six months that he served as an independent contractor physician reading films for UI, he observed that Defendants Young and Lauhoff made medical decisions for Defendant UI.

66.     Co-Relator Richard Chesbrough, as Medical Director with Defendant UI, was not involved in hiring or firing decisions of the technical staff.

67.     When Co-Relator Richard Chesbrough began as Defendant UI's Medical Director, Defendant UI had no policies and procedures and no organizational chart in place.

68.     Defendant UI's employees did not know who they reported to within the organization.

69.     Defendant UI did not have a governing Board of Directors.

70.     Co-Relator Richard Chesbrough had little, if any, input into the decisions regarding Defendant UI's equipment purchases or supplies.

71.     Throughout his tenure as Medical Director, Co-Relator Richard Chesbrough made numerous attempts to create policies and procedures to address the quality of the testing performed, the proper operation and calibration of the equipment used to perform tests and the qualifications of non-physician personnel who used the equipment.

72.     Despite Co-Relator Richard Chesbrough's efforts to create and implement policies and procedures within Defendant UI, Defendants and their staff routinely ignored the policies and procedures, including but not limited to Co-Relator Richard Chesbrough did not authorize the performance of breast ultrasound services off-site without a radiologist in attendance.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

73.    Despite this practice being forbidden under Dr. Chesbrough's directives, Defendant UI's staff routinely performed breast ultrasound imaging with its mobile ultrasound service without a radiologist in attendance.

74.    Defendant's practice of allowing techs to perform breast ultrasound services without a radiologist supervising created serious patient safety hazards because techs lack the requisite skill and training to perform these tests without radiologist supervision.

75.    On or about the summer of 2005, Defendant UI, through its management, unilaterally decided to cease provision of mammography services.

76.    The cessation of mammography services represented a tremendous disruption in patient services, leaving hundreds of patients without access to UI's mammography services.

77.    The referring physicians with patients affected by Defendant UI's cessation of mammography services were required to refer their patients elsewhere.

78.    The decision to close the mammography services was done without any input from Co-Relator Richard Chesbrough or his staff of radiologists.

79.    Defendants informed Co-Relator Richard Chesbrough of its decision to terminate the provision of mammography services after the decision was made.

80.    Defendants stopped providing mammography services when they knew that UI would not pass MQSA inspections because of the poor quality of equipment and UI did not want to spend the money to comply with strict regulations covering mammography.

81.    Dr. Chesbrough resigned from the position of Medical Director in July 2005.

82.    Following Dr. Chesbrough's resignation, defendants Young and Lauhoff were aware that UI had no Medical Director.

83.    Phillip Young often referred to himself as the Medical Director in violation of Medicare requirements.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

84.    UI operated without a Medical Director from July 2005 to January 2006.

85.    Based on Dr. Chesbrough's observations, it appeared that the Medical Director hired in January or February 2006 had no greater role than Dr. Chesbrough did as Medical Director.

86.    During Dr. Chesbrough's 16 months of work for UI, it also became apparent that there were numerous violations of the on-site supervision requirements as outlined by Medicare regulations 42 C.F.R. 410.33.

87.    These requirements mandate that diagnostic testing be performed at each location, with the appropriate level of physician supervision.

88.    Based on Dr. Chesbrough's observations UI systematically failed to provide onsite supervision for contrast injections for CT and MRI services.

89.    Under Medicare regulations, these types of services require "direct" physician supervision.  This requires that a radiologist be in the immediate area at the time of the injection and examination.

90.    Defendant UI as an IDTF was and is required to have appropriate equipment and emergency medications available in a crash-cart located in the immediate treatment area.

91.    Defendant UI systematically failed to meet these requirements.

92.    During the time when Dr. Chesbrough's radiology group worked for UI, they were physically located at the Dearborn Heights facility virtually the entire time.

93.    On rare occasions a radiologist would travel to the Ypsilanti or Auburn Hills facilities to perform "personal supervision" of arthrograms or other medically invasive studies.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

94.     However, the remainder of the time Dr. Chesbrough and the other physicians were physically located at Dearborn Heights, reading studies over the PACS Teleradiolgy system.

95.     The result of UI's staffing arrangement meant that patients having contrast injections in Ypsilanti and Auburn Hills did not have radiologist supervision.

96.     In addition, Dr. Chesbrough discovered that emergency medications and emergency (life saving) equipment were also not in place, in the event of an allergic reaction.

97.     UI technologists were performing injections and did not know who was supposed to be supervising the study.

98.     According to the technologists at Ypsilanti and Auburn Hills, there were supposed to be some physicians somewhere in the building who could be available in the event of an emergency.  However, these arrangements were loosely organized and did not meet the mandates of the Medicare regulations.

99.     Dr. Chesbrough discovered that there was no emergency medical equipment and medications in the crash-carts at both the fixed sites and at the mobile CT and MRI trucks and meant a physician could not have properly treated a patient, in the event of an emergency.

100.    The lack of requisite emergency equipment represented a serious violation of basic standards of care in diagnostic radiology.

101.    By Dr. Chesbrough's calculations, 60% of the MRI studies performed at UI were performed at sites that did not have radiologist supervision.

102.    Of the 60%, approximately half of those would require supervision for contrast injections.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

103.   Approximately 80% of the CT scans were performed offsite or on mobile trucks, without appropriate radiologist supervision, half of them for contrast.

104.   For MRI examinations, this represents over 1,990 patients, which were performed without appropriate supervision.  For CT scans, this represents over 1,850 patients performed in violation of Medicare requirements.   Given that approximately 30-40% of UI patients were Medicare recipients, this represents a significant number of patients, and significant Federal false claims, on an annual basis.

105.   During Relators' contracted employment with UI, they became aware of UI marketing practices.

106.   UI hired the Operations Director for Radiology Medical Consultants, Relator Kim Chesbrough, as its Sales Manager in April 2005.

107.   In her position within the marketing and sales organization of UI, Relator Kim Chesbrough became aware of systematic and longstanding kickback schemes, which were in place, to encourage referring physicians to direct referrals to UI.

108.   Under these kickback schemes, UI solicited and received referrals, directly and indirectly, in return for tickets to various sporting events, and dinner gift certificates to area restaurants.

109.   UI surveyed physicians as to their preferences of concerts, sporting events and restaurants.

110.   According to conversations with Defendant Young, UI spent over $600,000.00 in this referral kickback scheme for the calendar year 2004.

111.   Defendant Young referred to Defendant Lauhoff and his daughter as the "father and daughter greasy palm team."

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

112.   Co-Relator Chesbrough, upon learning of this kickback scheme, advised Defendants to cease this conduct.

113.   Defendants refused to cease the kickback scheme.

114.   Co-Relator Kim Chesbrough quit her position as Sales and Marketing Director after only a few months, due in large part to revelations of the illegal marketing scheme.

115.   In addition to the above schemes, UI also systematically allowed for split billing, whereby UI would bill for some of the patient's tests performed at a host site, and allow the host site to bill for other examinations performed on patients, all on one scheduled day in violation of the Stark and anti-kickback laws.

116.   UI and the host site physician are not allowed to pick-and-choose who is going to bill which insurance company on the same day.  This essentially amounts to a scheme to induce referrals and generate fraudulent payments from Medicare and other third party payers.

117.   Examples of this type of split billing occurred at Anchor Bay Medical Clinic, in Anchor Bay, Michigan.

118.   Other split billing sites involved Dr. Gwen Washington, and Dr. Theodore Engelmann as well as other clients of Universal Imaging.

119.   Viztek PACS System was poorly installed and poorly maintained, and thus did not allow for quality radiology interpretations.

120.   Because of the poor construction of the PACS and internet systems, images were often too dark, or poorly visible on UI's computer monitors.

121.   In addition, UI did not have any ability to retrieve old studies automatically through the Viztek PACS, thereby preventing comparison studies.

122.   Further, there was no radiology information system, whereby old reports were available to the radiologist for review.   These deficiencies are not standard in radiology departments throughout the country, and as fail to meet the standard of care.

123.   Radiologists struggled to obtain prior reports and prior images at UI.  This often resulted in unnecessary repeat studies and poor quality of interpretations, which negatively affected patient care.

124.   Radiology Medical Consultants and its physicians brought these serious concerns to the attention of Defendants.

125.    However, no changes were ever made in the PACS system, and the radiologist's complaints were routinely ignored.

126.    UI was performing Persantine stress tests on asthmatic patients, which is a known contraindication to performing this type of examination resulting in the near death of at least one patient.

127.   Physicians working with or for UI strongly recommended that UI cease this policy.

128.   UI continued to allow Persantine stress tests on patients with asthma.

129.   UI systematically failed to meet basic safety precautions resulting in billing for services not rendered or billing for services provided in an unsafe manner.

130.   Defendants engaged in other unsafe acts or omissions that resulted in billing for unnecessary services or for services that were not provided in violation of federal Medicare law, including:

      a.    Lack of appropriate patient histories, thereby compromising medical care and resulting in improper billing due to the lack of requisite documentation for the services performed;

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

b. Suboptimal technologists who lacked the required certification of Registered Diagnostic Sonographer (RDS), lacked the skills and/or training to perform studies according to standards in the industry;

c. Poor timing of contrast injection during CT scans, which limited the value of the study, thereby resulting in repeat studies and exposing patients to unnecessary health risks;

d. Poor positioning of patients for x-rays which led to markedly deficient imaging, necessitating repeat studies, thereby exposing patients to additional exposure to dangerous radiation;

e. Communication errors with the technologists and UI leading to compromised medical care;

f. Systematic problems with technologists' completion of worksheets and intake forms during ultrasound examinations thereby compromising medical care and resulting in improper billing due to requisite documentation for the services performed;

g. Serious delays encountered between the time an imaging study was initially performed, and the time it was sent to the Viztek PACS System.  In some cases, this could be as much as seven to ten days of delay; compromising medical care and treatment; and

h. Delay with printed studies that were not sent to the PACS System.  In one of the most notable cases, one of the ultrasound technologists had over 25 patient studies in the trunk of her car for over one week.

131. Many of UI's radiology technologists performed imaging studies without the requisite training to perform such studies.

## COUNT I

## FALSE CLAIMS ACT - - CONSPIRACY

132. Relator realleges and incorporates by reference paragraphs 1 through 132 of this Complaint, inclusive.

133. Defendants herein conspired to defraud the United States government by causing false or fraudulent claims to be presented and/or paid for the purpose of obtaining, or

aiding to obtain the payment or approval by the United States government of false or fraudulent claims by engaging in the following acts:

a. Universal Imaging was and is an illegally formed corporation and as such is illegally billing the federal government;

b. Failure to Comply with Medicare Requirements for Physician Supervision;

c. Violations of Onsite Supervision Requirements;

d. Violations of Anti-kickback Provisions through their illegal marketing scheme and illegal fee splitting;

e. Improperly maintained Viztek PACS System;

f. Improper nuclear cardiac studies on people with asthma;

g. Lack of appropriate patient histories, thereby compromising medical care and resulting in improper billing due to the lack of requisite documentation for the services performed;

h. Suboptimal technologists who lacked the required certification of Registered Diagnostic Sonographer (RDS), lacked the skills and/or training to perform studies according to standards in the industry;

i. Poor timing of contrast injection during CT scans, which limited the value of the study, thereby resulting in repeat studies and exposing patients to unnecessary health risks;

j. Poor positioning of patients for x-rays which led to markedly deficient imaging, necessitating repeat studies, thereby exposing patients to additional exposure to dangerous radiation;

k. Communication errors with the technologists and UI leading to compromised medical care;

l. Systematic problems with technologists' completion of worksheets and intake forms during ultrasound examinations thereby compromising medical care and resulting in improper billing due to requisite documentation for the services performed;

m. Serious delays encountered between the time an imaging study was initially performed, and the time it was sent to the Viztek PACS System. In some cases, this could be as much as seven to ten days of delay; compromising medical care and treatment;

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

n.  Delay with printed studies that were not sent to the PACS System.  In one of the most notable cases, one of the ultrasound technologists had over 25 patient studies in the trunk of her car for over one week; and

o.  Poor technologist training resulting in billing for services not rendered.

134.   The United States government, unaware of the foregoing circumstances and conduct of Defendants herein, made full payment on said claims, all of which resulted in its being damaged in an amount to be determined.

## COUNT II

## PRESENTATION OF FALSE CLAIMS

135.   Relator realleges and incorporates by reference paragraphs 1 through 134 of this Complaint, inclusive.

136.   Defendants knowingly presented or caused to be presented to an agency, officer or employee of the United States false or fraudulent claims for payment which were misallocations or misappropriations of federal funds inconsistent with the federal law governing Medicare, the Stark Act and the Anti-Kickback statute.

137.   The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments of said claims which resulted in its being damaged in an amount to be determined.

## COUNT III

## FALSE RECORDS

138.   Relator realleges and incorporates by reference paragraphs 1 through 137 of this Complaint, inclusive.

139.   Defendants knowingly made, used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the United States government.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

140.   The United States, unaware of the foregoing circumstances and conduct of the Defendants made full payments that resulted in its being damaged in an amount to be determined.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

## COUNT IV

## VIOLATIONS OF ANTI-KICKBACK STATUTE AND STARK II

141.    Relator incorporates by reference paragraphs 1 through 140 of this Complaint, inclusive.

142.    The provisions of 42 U.S.C. Section 1320(a-7)(b)(1)(2) and (3), commonly known as the Anti-Kickback statute, provide as follows:

(b) illegal remuneration,

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishings of any item or service for which payment may be made, in whole or in part, under a Federal healthcare program, or

(B) in return for purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part under a Federal healthcare program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000.00 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made, in whole or in part, under a Federal healthcare program, or

(B) shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000.00 or imprisoned for not more than five years, or both.

(3) (1) and (2) shall not apply to

(A), a discount or other reduction in price obtained by a provider of services or other entity under a Federal healthcare program if the reduction in price is properly disclosed and appropriately reflected in the costs, claims or charges made by the provider or entity under a Federal healthcare program;

(B) any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services;

(C) any amount paid by a vendor of goods or services to a person authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services reimbursed under a Federal healthcare program if:

(i) the person has a written contract with each such individual or entity which specifies the amount to be paid to the person which amount may be a fixed amount or a fixed percentage of the value of the purchases made by each such individual or entity under the contract, and

(ii) in the case of an entity that is a provider of services (as defined in Section 1395X(u) of this title), the person discloses (in such form and manner as

the Secretary requires) to the entity and, upon request, to the Secretary the amount received from such vendor with respect to purchases made by or on behalf of the entity;

(D) a waiver of any co-insurance under part B of subchapter XVIII of this chapter by a Federally qualified healthcare center with respect to an individual who qualifies for subsidized services under a provision of Public Health Service Act, 42 U.S.C.A. Section 201 et seq;

(E) any payment practice specified by the Secretary and regulations promulgated pursuant to Section 14(a) of the Medicare and Medicaid Patient and Program Protection Act of 1987; and

(F) any remuneration between an organization and an individual or entity providing items or services or a combination thereof, pursuant to a written agreement between the organization and the individual or entity if the organization is an eligible organization under Section 1395 mm of this title or if the written agreement, through a risk-sharing arrangement, places the individual or entity at substantial financial risk for the cost or utilization of the items or services or a combination thereof which the individual or entity is obligated to provide.

143.    Essentially, 42 U.S.C. Section 1320(a-7)(b)(7) prohibits payments by medical and/or healthcare providers to other medical and/or healthcare providers for referrals and self-referrals wherein a provider refers patients to the other healthcare providers which the referring physician has a financial relationship.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

144.   Effective July 1, 1995, 42 U.S.C. Section 1395(nn), commonly known as "Stark II" prohibits a physician from referring Medicare patients for designated health services to other entities in which the referring physician has a financial relationship.

145.   Ten general exceptions exist within Stark II, 42 U.S.C. Section 1395(nn)(b), that allow referrals between entities maintaining financial relationships.   These exceptions are commonly referred to as "safe harbors."   If the financial relationship between the entities does not fall within one of the safe harbor exceptions contained in 42 U.S.C. Section 1395(nn)(b), Stark II prohibits a physician from making a referral to an entity with which the physician or any member of the physician's immediate family has a "financial relationship" for the "furnishing of designated health services."

146.   Designated health services under Stark II include: (a) clinical laboratory services, (b) physical therapy services, (c) occupational therapy services, (d) radiology or other diagnostic services, (e) radiation therapy service, (f) durable medical equipment, parenteral and enteral nutrients equipment and supplies, (g) arthritic and prosthetic devices, (h) home health services, (i) out-patient prescription drugs and (j) in-patient and out-patient hospital services. 42 U.S.C. 1395 (nn)(h)(6).

147.   Stark II defines "financial arrangements" as an "ownership or investment interest in the entity to which a referral is made." That ownership interest may be direct or indirect. 42 C.F.R. Section 411.351.

148.   Defendants certified to the government that they were in compliance with all federal and state regulations, including the Anti-Kickback statute and Stark II. **DISCUSS WITH CLIENTS**

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

149.   When Defendants certified that they are in compliance with all regulations but, in fact, are not, Defendants have made false claims to the government upon which the government relied on making reimbursement to the Defendants.

150.   Defendants' false certifications constitute violations of the False Claims Act.

151.   As detailed in the preceding paragraphs, Defendants paid a number of physicians illegal remuneration in exchange for their referral of patients to Defendant UI.

152.   The relationship as depicted in preceding paragraphs 105-118 between the Defendants and various physician and entities is in direct violation of the Anti-Kickback statute, 42 U.S.C. Section 1328-7(a).

153.   In exchange for this remuneration, physicians referred Medicare beneficiaries to Defendant UI services were rendered and reimbursed from Medicare.

154.   The physicians and entities' illegal referrals of Medicare patients to Defendant UI violated the Anti-Kickback statute and were not reimbursable by Medicare.

155.   In addition to violating the Anti-Kickback statute, the relationship between Defendant UI and various physicians who participated in the illegal marketing or billing scheme also violates Stark II, 42 U.S.C. Section 1395(nn) in that these physicians and entities had financial relationships with Defendant UI; (b) Because of these financial relationships, these physicians and entities were prohibited from making referrals to Defendant UI for certain designated health services; (c) As a result of these financial relationships, Defendant UI was prohibited from soliciting referrals from these physicians or entities for certain designated health services; and (d) the health services depicted in the preceding constitute designated health services.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

156.    In keeping with Medicare practice and procedure, Defendants submitted claims for reimbursement of numerous health services that they provided to government-funded health insurance programs.

157.    Defendants obtained payments from Medicare for these services rendered to Medicare program beneficiaries based on a cost reimbursement methodology.

158.    When seeking reimbursement for their services from Medicare, Defendants presumably certified to the federal government that they were in compliance with all federal and state regulations, including the Anti-Kickback statute and Stark II.   When Defendants certified that they were in compliance with all state and federal regulations but, in fact, were not, they made false claims to the federal government upon which the government relied on making reimbursement to the Defendants.  The false certification constitutes a violation of the False Claims Act.

159.    Had Medicare been aware of Defendants' illegal conduct, it would not have reimbursed Defendants for their respective services.

160.    By contract and by law, Defendants were required to comply with all the applicable rules and regulations of the Medicare and Medicaid programs and the United States Department of Health and Human Services. Defendants acted with actual knowledge and/or reckless disregard of the applicable rules and regulations and knew or should have known that they were not entitled to Medicare for the various reimbursement claims they submitted.

161.    The United States Treasury has been damaged as a result of Defendants' violation of the False Claims Act.

## PRAYER FOR RELIEF

WHEREFORE, Relators on behalf of the United States demands judgment as follows:

A.     The United States is entitled to reimbursement of the federal funds obtained by Defendants as a result of fraudulent claims submitted to the United States.

B.     The United States is further entitled to treble damages based upon the amount of damages sustained by the United States as a result of the Defendants' violations of 31 U.S.C. Section 3729(a)(2).

C.     The United States is entitled to civil penalties as required by 31 U.S.C. Section 3729(a) for each of the Defendants' fraudulent claims.

D.     Relators are also entitled to reasonable attorney fees and costs pursuant to 31 U.S.C. Section 3730(d); and

E.     An order of partial distribution pursuant to 31 U.S.C. Section 3730(d), to the Qui Tam Relators Richard Chesbrough and Kim Chesbrough, equivalent to a percentage of the judgments recovered against Defendants, plus their costs and attorneys' fees.

Respectfully submitted,

SOMMERS SCHWARTZ, P.C.

PATRICIA A. STAMLER (P35905)
pstamler@sommerspc.com
Attorney for Plaintiffs-Realtors
2000 Town Center, Suite 900
Southfield, MI 48075-1100
(248) 355-0300

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

# CIVIL COVER SHEET County in which this action arose Washtenaw

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA, ex rel, RICHARD CHESBROUGH, M.D., and KIM CHESBROUGH

**DEFENDANTS**

UNIVERSAL IMAGING, INC., a Michigan corporation, PHILLIP J. YOUNG, MARK LAUHOFF, Jointly and Severally

(b) County Of Residence of First Listed Plaintiff ___Oakland County, Michigan___
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant ___Washtenaw County, Michigan___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED

(c) Attorney's (Firm Name, Address And Telephone Number)
Patricia A. Stamler (P35905)
Sommers Schwartz, P.C.
2000 Town Center, Suite 900
Southfield, MI 48075
248-355-0300

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place An "X" In One Box Only)

☒ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III. CIT (Fo

Citize

Case: 5:06-cv-15638
Assigned To: O'Meara, John Corbett
Referral Judge: Morgan, Virginia M
Filed: 12-19-2006 At 09:56 AM
CMP USA V. UNIVERSAL IMAGING (POSSI
BLE SEALED MATTER) (JTC)

## IV. NATURE OF SUIT (Place An "X" In One Box Only)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury— Med. Malpractice
☐ 365 Personal Injury— Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI ( 405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant
☐ 871 IRS — Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☒ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
**Habeas Corpus**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

## V. ORIGIN (Place An "X" In One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite The Us Civil Statute under which you are filing (Do Not Cite Jurisdictional Statues Unless Diversity):

This action is brought pursuant to 31 U.S.C. 3729 et seq. for damages and other relief under the False Claims Act.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY

(See instructions)

JUDGE _____ DOCKET NUMBER _____

DATE
December 19, 2006

SIGNATURE OF ATTORNEY OF RECORD
*Patricia*

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## PURSUANT TO LOCAL RULE 83.11

1.         **Is this a case that has been previously dismissed?**      ☐ Yes  ☑ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.       Other than stated above, are there any pending or previously discontinued or dismissed companion cases in this or any other court, including state court? (Companion cases are matters in which it appears substantially similar evidence will be offered or the same or related parties are present and the cases arise out of the same transaction or occurrence.)    ☐ Yes  ☑ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes : _____