## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. RICHARD CHESBROUGH, M.D.,<br>and KIM CHESBROUGH, | ) )<br>)<br>) | **FILED IN CAMERA** |
| Plaintiffs, | )<br>)<br>) | |
| vs. | )<br>)<br>) | CIV. No. 5:06-cv-15638-JCO-VMM<br>HON.   JOHN CORBETT O'MEARA<br>MAG. JUDGE VIRGINIA M. MORGAN |
| UNIVERSAL IMAGING, INC.,<br>MRI LEASING, LLC, d/b/a PREMIER<br>LEASING AND MANAGEMENT<br>SERVICES, LLC, PHILLIP J. YOUNG,<br>MARK LAUHOFF, and GWENDOLYN<br>WASHINGTON, Jointly and Severally, | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants, | )<br>) | |
| and | )<br>) | |
| TCF BANK,<br>TCF INVESTMENTS,<br>JP MORGAN CHASE,<br>FIFTH THIRD BANK,<br>CHASE BANK,<br>COMERICA BANK,<br>GREGORY SCHWARTZ & CO. INC. | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| Garnishees. | )<br>) | |

_____

## APPLICATION IN CAMERA OF THE UNITED STATES UNDER THE FEDERAL DEBT COLLECTION PROCEDURES ACT FOR PRE-JUDGMENT GARNISHMENTS AND OTHER REMEDIES

The United States, plaintiff in this action, applies to this Court for pre-judgment

garnishments pursuant to sections 3101 and 3104 of the Federal Debt Collection Procedures Act of

1990, 28 U.S.C. §§ 3001-3308 and for other prejudgment remedies to ensure that the proceeds of a

sale of assets of the debtor Universal Imaging, Inc. scheduled on January 5, 2012 will not be dissipated pending the outcome of this litigation pursuant to the authority set forth in 28 U.S.C. § 3003(c)(7).   This Court has jurisdiction over this application under 28 U.S.C. § 3101(a) and § 1345.   The pre-judgment remedies provisions of the Federal Debt Collection Procedures Act provide that the Court shall freeze assets in place upon an application of the United States that meets the requirements of that Act so that the assets will not be dissipated, while simultaneously providing the defendants with notice at the time the remedy is put into effect and affording the defendants an opportunity for an expedited hearing so that they are not prejudiced.

The Federal Debt Collection Procedures Act states that in conjunction with a complaint on a claim for a debt, the United States may "make application under oath to a court to issue any prejudgment remedy," 28 U.S.C. § 3101(a), including garnishments of property in the control of third parties, § 3104.   The purpose of the pre-judgment remedy is to establish "security for such judgment (and interest and costs) as the United States may recover on a claim for a debt."   28 U.S.C. § 3102(b); § 3105(a).   Any assets of the debtor are available for a prejudgment remedy if the statutory requirements are met; there is no tracing requirement.   The statute provides that if the United States makes the requisite statutory showing to obtain a prejudgment remedy, the Court "shall issue all process sufficient to put into effect the prejudgment remedy sought."   28 U.S.C. § 3101(e).

Because the debtors have not yet been served with any complaint and are therefore not yet parties, and in order to ensure that assets are not further dissipated once a debtor knows that the United States has sought such a remedy but not yet implemented it, the request for a prejudgment remedy is an ex parte proceeding; the United States serves a copy of this application and the order granting prejudgment remedies on the defendants at the time that the prejudgment remedy *is put*

2

*into effect*.  28 U.S.C. § 3004(c).  The defendants who are now named in the complaint are at the same time provided with statutory notice that explains their rights to move to quash the remedy, to obtain a hearing should they move to quash, and the legal bases upon which they may move to quash.  28 U.S.C. § 3101(d).

In support of the application for a pre-judgment remedy, the United States must file an affidavit, 28 U.S.C. §  3101(c), for which it may substitute a declaration, *see* 28 U.S.C. § 1746, "establishing with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application." *Id.* § 3101(c)(1)(a). The affidavit "may be made on information and belief." *Id.* § 3006. The affidavit shall state as follows:

     a.   "the amount of the debt claimed," § 3101(c)(2)(A);

     b.   that the United States has reasonable cause to believe that the debtor "has or is about to assign, dispose, remove [or] conceal * * * property with the effect of hindering, delaying, or defrauding the United States," 28 U.S.C. §§ 3101(c)(2)(B); 3101(b)(1)(B); or alternatively that the United States has reasonable cause to believe that the debtor "has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States." 28 U.S.C. § 3101(b)(1)(C).

     c.   that following issuance of the writ(s), the debtor will be afforded an opportunity for a hearing. 28 U.S.C. § 3101(a)(3)(A).

All statutory requirements for issuance of the pre-judgment remedies set forth in 28 U.S.C. §§ 3101 and 3104 have been satisfied in this case.  The attached declaration of United States Department of Health and Human Services Special Agent Steve Rinaldi, which references the

attached declarations from subject matter experts Kathleen McNamara and Rodney L. Crawford,

establishes the basis for prejudgment garnishments and other remedies sought in this case.

A.   <u>AMOUNT OF THE DEBT</u>

      1.     As set forth in the attached declaration of Special Agent Steven Rinaldi, the

defendants participated in several large scale frauds on the Medicare system, and the amount of the

False Claims Act debt in this case is at least $ 148.5 million.

B.   <u>BASIS OF THE ACTION</u>

      2.     The Federal Debt Collection Procedures Act allows pre-judgment remedies to be

used in tort and contract cases and actions seeking to recovery a penalty.   28 U.S.C. §§ 3102(b);

3105(b).   The action set forth in the separate complaint which will be filed today electronically (a

copy of which is attached to this pleading) is all of these, and therefore the remedy of prejudgment

garnishment is available under these circumstances. The False Claims Act counts of the complaint

embody both "an action to recover a * * * penalty," and "an action against the debtor for damages

in tort."   False Claims Act treble damages and penalties constitute a claim for a "debt" as defined

by the Federal Debt Collection Procedures Act. *U.S. ex rel. Doe v. DeGregorio,* 510 F. Supp. 2d

877, 884 (M.D. Fla. 2007); *United States v. Teeven*, 862 F. Supp. 1200, 1225 (D. Del. 1992). The

claim in the complaint for unjust enrichment is also a "debt," because it is "on a contract, express or

implied" that "is not fully secured by real or personal property."   28 U.S.C. §§ 3102(b); 3105(b).

C.   <u>FACTS SUPPORTING THE PROBABLE VALIDITY OF THE CLAIM</u>

      3.     The facts supporting the probable validity of the United States' claim in this case

are set forth in detail in the attached declaration of Special Agent Steve Rinaldi and the McNamara

and Crawford declarations that it refers to that are attached.

D.   <u>REASONABLE CAUSE TO BELIEVE THAT DEBTORS ARE DISPOSING OF</u>

<u>PROPERTY</u>

4.      The United States has reasonable cause to believe that each of the following debtors, Phillip J. Young, 100% owner of Universal Imaging, Inc. and MRI Leasing LLC, and Mark Lauhoff, former owner of Universal Imaging, Inc. and MRI Leasing LLC, "has or is about to [] dispose, remove, [or] conceal" property "with the effect of hindering, delaying, or defrauding the United States," 28 U.S.C. §§ 3101(c)(2)(B); 3101(b)(1)(B), and that each "has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States."   28 U.S.C. § 3101(b)(1)(C).

As set forth in the declaration of Steve Rinaldi referencing the attached declaration of Rodney Crawford, the United States was informed by counsel for Universal Imaging, Inc. on the afternoon of Friday December 23, 2011, that defendants Universal Imaging, Inc. and MRI Leasing LLC and their 100% owner Phillip J. Young will sell Universal's major asset to a third party, North Oakland North Macomb Imaging, Inc., on January 5, 2012, and will thereafter distribute the proceeds.   While the United States was finalizing what it understood were agreed-upon settlements in this case with all of these parties and awaiting their signatures on the settlement documents, Young and Universal were deciding to repudiate the settlement and liquidate Universal, providing notice of such sale only on the Friday afternoon before this Christmas weekend, and then to distribute the assets beyond the reach of the United States. Without orders in place preventing the further disbursement of these funds as these entities are liquidated, these parties are likely to place any assets beyond reach.   Similarly, while the United States had a settlement in principle with defendant Mark Lauhoff through his counsel, his counsel informed us last week that does not return his calls, and we have not been able to obtain his signature on any

5

agreement.

The United States therefore seeks an order directing that no funds may be disbursed from the sale of assets of Universal Imaging, Inc. or MRI Leasing LLC to North Oakland North Macomb Imaging, Inc. other than a disbursement to TCF Bank to pay secured debt, and that the remaining funds shall be paid to the Clerk of Court under an order to be prepared by the United States and approved in advance by the Clerk of Court pursuant to Local Rule 67.1. If the defendants prevail in the litigation the funds shall be released. The United States does not seek to interfere in the sale to North Oakland North Macomb Imaging and therefore has not sought a garnishment or sequestration order directed to that entity.

The proposed order also provides that any future asset sales shall not take place without at least 10 days' notice to the United States and a demonstration by the debtor that such sale is fair market value, and all proceeds of any such sales shall similarly be paid to the Clerk of the Court and placed in the court's registry pending the outcome of this litigation.

The United States also seeks to garnish these bank accounts and/or investment accounts belonging to co-conspirators to whom millions of dollars in wrongfully obtained Medicare funds have been transferred, including the two corporate entities and the current and former owners, Phillip J. Young and Mark Lauhoff.   As to their personal assets, while engaging in these sham settlement negotiations, both defendants Phillip J. Young and Mark Lauhoff had real property that was sold in 2011 and Mark Lauhoff has had other real property titled to him listed for sale.    If there were proceeds from these sales beyond debt due to lenders, the United States is unaware of their whereabouts.

E.  <u>NO BOND REQUIRED</u>

5.      No bond is required of the United States.   28 U.S.C. § 3101(c)(3).

6

G.   <u>APPOINTMENT OF SPECIAL PROCESS SERVERS</u>

6.      The Federal Debt Collection Procedures Act states that, except as otherwise provided, "the Federal Rules of Civil Procedure shall apply with respect to actions and proceedings under this chapter." Federal Rule of Civil Procedure 4(c) provides that this Court may appoint a special process server. The United States respectfully requests that this Court appoint Steve Rinaldi, Special Agent, Office of Inspector General, Department of Health and Human Services, and Jonathan Sonbay, Health Care Fraud Investigator, Office of the United States Attorney, Eastern District of Michigan, as special process servers to effectuate the prejudgment remedies set forth in the proposed Writ. The proposed Writ so provides.

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney

__/s Joan E. Hartman_____
JOAN E. HARTMAN
Assistant United States Attorney
211 W. Fort St. Room 2001
Detroit, MI 48226
(313) 226-9190

December 27, 2011

7

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA, )
ex rel. RICHARD CHESBROUGH, M.D., )
and KIM CHESBROUGH, )
                )
         Plaintiffs, )
                )
vs. )
                )
                )
                )
UNIVERSAL IMAGING, INC., )
MRI LEASING, LLC, d/b/a PREMIER )
LEASING AND MANAGEMENT )
SERVICES, LLC, PHILLIP J. YOUNG, )
MARK LAUHOFF, and GWENDOLYN )
WASHINGTON, Jointly and Severally, )
                )
         Defendants, )
                )
and )
                )
TCF BANK, )
TCF INVESTMENTS )
JP MORGAN CHASE )
FIFTH THIRD BANK )
CHASE BANK )
COMERICA BANK )
GREGORY SCHWARTZ & CO. )
                )
         Garnishees. )
                )

CIV. No. 5:06-cv-15638-JCO-VMM
HON.  JOHN CORBETT O'MEARA
MAG. JUDGE VIRGINIA M. MORGAN

## DECLARATION OF STEVE RINALDI
### SPECIAL AGENT, DETROIT FIELD OFFICE, OFFICE OF INVESTIGATIONS
### U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
### <u>OFFICE OF INSPECTOR GENERAL</u>

I, Steve Rinaldi, declare as follows:

1.      I am a Special Agent with the Detroit Field Office of the U.S. Department of

Health and Human Services Office of Inspector General, Office of Investigations.  I have held this position since June 2007.   The Office of Inspector General, Office of Investigations is charged with responsibility for investigating cases of fraud and abuse practiced upon the Medicare program.

2.      I submit this Declaration in support of the United States' Application for Prejudgment Garnishments and Other Remedies in the above-case, in order to provide factual support for the two showings that the government must make in order to obtain a prejudgment remedy: (a) the "probable validity" of the debt, and (b) "reasonable cause to believe" that the defendants either have "assign[ed], dispose[d, or] remove[d]" their property "with the effect of hindering, delaying, or defrauding the United States," or either has or is about to convert their property "into money in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States."

3.      I base this Declaration on documents that I have reviewed, witnesses I have interviewed, and other information that I have obtained in the course of this investigation as part of my official duties as a fraud investigator.  I also rely in part for this showing on the attached Declarations from two subject matter experts, Kathleen McNamara and Rodney Crawford.

4.      This case has been on the Court's inactive calendar since March 2011 because the government had been led to believe that there was an impending settlement that it would conclude with the major defendants, Universal Imaging, Inc. and two owners, Phillip Young (current owner) and Mark Lauhoff (former owner).  The settlements had been reviewed and approved by all of the parties including four levels of review at the U.S. Department of Justice in Washington, DC.  Following receiving this approval, however, the United States has been unable

2

to obtain signatures by the defendants on the settlement documents.  We were notified on the Friday afternoon of this past Christmas weekend, December 23, 2011, by counsel for Universal and its owner, that Universal intends to sell its major assets on January 5, 2011 and distribute them to another shell corporation owned by Universal's sole shareholder Phillip Young.  As explained below, a few weeks ago that counsel sought to obtain the government's approval in writing for this transfer without disclosing the nature of the transaction.  When the government realized that this was a fraudulent transfer designed to place the company's assets beyond the reach of any settlement, it refused to state that it had no objection.  Universal then abandoned the agreed-upon settlement.  As to the former owner of Universal Imaging, Inc., Mark Lauhoff, the government has had a settlement in principle pending with him for several months, and now his counsel informs us that Mr. Lauhoff does not return his telephone calls.  While engaging in sham settlement negotiations, these defendants have been selling assets in a manner prejudicial to the United States, with both Mr. Lauhoff and Mr. Young selling major pieces of real estate that they owned personally in 2011 and Universal about to distribute all of its assets beyond reach.

*Probable Validity of the Debt*

5.      Universal Imaging, Inc. is a type of medical provider, called an "independent diagnostic testing facility," that is permitted to enroll in the Medicare program even though the owners of the entity do not have to be medical professionals.  Because it is a business and therefore not directly governed by codes of medical ethics, Medicare subjects it to heightened scrutiny to make sure that there is an appropriate level of physician involvement in the care of patients.  Regulations in place since 1999, before Universal became an independent diagnostic testing facility, require heightened levels of physician supervision at all levels, and provide that

3

the physicians employed as supervisors "must evidence" proficiency in the particular types of tests they are supervising under standards set by the Medicare contractor that is employed to process claims in the State.  42 C.F.R. 410.33(b)(2).  The Medicare contractors use a particular form called the 855-I for independent diagnostic testing facilities to provide the identities of their supervising physicians, following which the contractor conducts a review to make sure that they are qualified, and if approved, they are entered into the contractor's computer system.  The form states that when physician supervisors change, the form must be resubmitted.  The form itself as well as repeated communications from Medicare personnel to Universal made clear that Universal's physician supervisors (as well as its technicians, its equipment and the scope of its business) had to be disclosed to Medicare and approved in advance.  Universal also had to disclose the particular types of diagnostic tests that it was intending to conduct and Medicare matched the credentials of the disclosed physicians to the codes defining the particular types of tests to make sure that the tests were being supervised by qualified personnel, and thereafter entered the physician's identity into its computer system with a code showing the particular types of tests that this physician had been approved to supervise.  Appropriate physician supervision complying with the rules applicable to that type of test is an inherent component of any diagnostic test and the test is not payable by Medicare if it has not been supervised in accordance with the regulations and program instructions.

6.     A review of Universal's accounting records through the course of this investigation has revealed that its business model and its patient base was almost entirely dependent on giving physicians a financial incentive to refer patients by splitting insurance fees with physicians, and on limiting any qualified and approved physician supervision or even

4

entirely eliminating it, while make repeated false statements to Medicare concerning supervision in its facilities and operations.  For example, between 2003 and mid-2008, our analysis shows that Universal paid just 13 physicians all of whom were in a position to and did make lucrative referrals to it, a total of $3.3 million, and received approximately $10 million in insurance payments as a consequence of those referrals.  Only one of these physicians had been approved by Medicare as a supervisor.  After Medicare was informed that Universal's facilities were not being supervised, Universal and its owners created false and backdated documentation in order to mislead Medicare into believing that the allegations as to lack of supervision, which were true, were misinformed.  After learning it was under investigation, Universal attempted to obtain Medicare approval for some of the physicians it was paying for referrals, in order to bolster its claim that it was paying them for "supervision" of the test rather than simply engaging in fee splitting, but many of these physicians were turned down because they were unqualified.

7.     As to Universal's business model, under it the identity of the biller (the physician or Universal) was dependent on the patient's insurance or the physician's preference, and the monies were split essentially the same way regardless of who was doing the billing.  For those physicians who wanted to bill insurance and actually wanted to use their own equipment and technician to perform the work, not Universal's, but who were prohibited from billing insurance because they lacked the qualifications required by the insurance company to perform the test, Universal simply billed the patients' insurance as if it had performed the work and returned the insurance fees to the physician, taking its cut.  Beyond the fraud on the insurance companies that this model entailed, since the insurance entities were led to believe that a qualified entity was actually performing the work, the American Medical Association has made clear that this type of

5

fee splitting is wrong. "Payment from or to a physician solely for the referral of a patient is fee splitting and is unethical. [H]ealthcare facilities that compensate physicians for referral of patients are engaged in fee splitting, which is unethical." American Medical Association Council on Ethical and Judicial Affairs. Code of Medical Ethics Chicago, Ill: American Medical Association, 2002; 149-151. Research shows that giving physicians this type of financial incentive in connection with their orders for diagnostic testing will increase the rate of their test orders by 49%.[1] This finding is consistent with twenty years' worth of literature on this subject finding that these financial incentives subvert physicians' independence and lead to unnecessary

---

[1] Bhargavan, Mythreyi, Sunshine, Jonathan H. and Hughes, Danny R., Clarifying the Relationship Between Nonradiologists' Financial Interest in Imaging and Their Utilization of Imaging, 197 Am. J. Roentgenology no. 5 W891-W899 (Nov. 2011).

tests.[2]

8.      Many types of diagnostic tests also have significant potential for patient harm if performed unnecessarily. For example, a major source of Universal's revenue was nuclear stress testing, which involves the injection of radioactive material into the patient which is then imaged as it moves through the bloodstream. Each nuclear stress test is the equivalent of approximately 100 chest xrays in terms of the effective radiation dose to the patient.[3] Because fee splitting

---

[2] *See, e.g.*, Kouri, Brian E., Parsons, Gregory R. and Alpert, Hillel R., *Physician Self-Referral for Diagnostic Imaging: Review of the Empiric Literature,* 179 Am. J. Roentgenology no. 4, 843-850 (Oct. 2002); Baker, Laurence C., *Acquisition of MRI Equipment by Doctors Drives Up Imaging Use and Spending,* 29 Health Aff no. 12, 2252-2259 (Dec. 2010); Hillman BJ, Joseph CA, Joseph BA, et al., *Frequency and Costs of Diagnostic Imaging in Office Practice: a Comparison of Self-referring and Radiologist-referring Physicians,* 1990 N Engl J Med 323:1604-1608 (review of 65,000 cases administered by 6000 physicians showed that diagnostic tests were performed 4.5 times more often when physicians referred patients to facility in which they had a financial interest); Hillman BJ, Olson GT, Griffith PE, et al., *Physicians' Utilization and Charges for Outpatient Diagnostic Imaging in a Medicare Population,* 1992 JAMA 268:2050-2054 (imaging examinations are performed 7.7 times more often when referrers have financial interest); Maitino AJ, Levin DC, Parker L, Rao VM, Sunshine JH. *Practice Patterns of Radiologists and Nonradiologists in Utilization of Noninvasive Diagnostic Imaging Among the Medicare Population 1993–1999,* 2003 Radiology 228:795-801 (in review of Medicare claims filed between 1993 and 1999, ultrasound examinations increased by 53% among nonradiologists while increasing only 15% among radiologists; nuclear imaging procedures increased 208% among nonradiologists while decreasing 2% among radiologists; magnetic resonance imaging increased 252% among nonradiologists but only 67% among radiologists; increased use of imaging most likely the result of self-referral); Levin DC, Rao VM, *Turf Wars in Radiology: the Overutilization of Imaging Resulting from Self-referral.* 2004 J Am Coll Radiol 1:169-172 (analysis of Medicare Payment Advisory Commission data finds the root cause of increases in imaging procedures to be self-referral, estimating that **half of all imaging procedures performed by nonradiologists are unnecessary).**

[3] *See* Table 1, "Estimated Effective Dose and Radiation-Related Cancer Risk From Exposure to Age 50 Years for Myocardial Perfusion Scans, According to Radiopharmaceutical and Protocol," *in* Amy Berrington de Gonzalez, DPhil; Kwang-Pyo Kim, PhD; Rebecca Smith-Bindman, MD; Dorothea McAreavey, MD, *Myocardial Perfusion Scans Projected Population Cancer Risks From Current Levels of Use in the United States*, CIRCULATION, 2010; 122: 2403-2410, at 2405.

drives up utilization it creates a significant potential for patient harm and also drives up costs. For this reason one of the basic Medicare payment rules is that Medicare does not pay for claims infected by these types of improper relationships.  Indeed, both Mark Lauhoff, the former owner of Universal, and a Universal employee on behalf of Phillip J. Young, signed certifications stating that they would not submit claims to Medicare that were infected by these types of relationships and recognizing that such infected claims are not payable.

9.      The payments that Universal made to physicians yielded a group of physicians who ordered diagnostic testing at much higher rates than their peers in comparable medical specialties.  Based on a peer comparison using Medicare data, many of these physicians were above the 90th percentile in test ordering compared to their peers.  In one especially egregious case, that of physician and defendant Gwendolyn Washington, the incentives that Universal created for her to refer nuclear stress tests to Universal, each worth $1000 to Universal, led to her being the outlier physician in the entire country on her rate of ordering of nuclear stress tests. Based on the time-limited data available to us, she was ordering up to 15 such tests for patients, one every six months, when the medical standards provide that because of the danger of these tests, even patients with moderate to severe heart disease should not receive them more than once every two years.  One patient told me that Washington had ordered "at least twenty" nuclear stress tests for him, and patients were told that these tests were "preventative."  They were not ordered based on any patient symptoms or any examination by Washington.  An employee in Washington's facility told me that Washington had a quota for such tests and employees would be severely criticized or fired if they did not produce enough patients for the quota, and that she was required to schedule patients every six months for these tests.  Our consultation with experts

8

in this area has disclosed, for example, that if Washington ordered 15 nuclear stress tests for 67 patients at age 50, one of those 67 would develop cancer *solely* as a result of these tests.

10.     Washington's patients were picked up from their homes by a driver and brought to Universal's facility en masse.  One of the drivers, Grady Herring, was Washington's brother-in-law and also was on Universal's payroll.  Universal's owners and its employees saw the Washington van come in each week and knew that these patients were coming every six months for these tests.  Universal had physicians reading these test results and knew that they were either normal or there was no change from any prior test and that they were unnecessary.  In addition to splitting fees with Washington for nuclear stress test referrals, Universal also paid one of its technicians to take one of Universal's portable ultrasound machines to Washington's office, where Washington directed her employees to schedule patients for multiple ultrasounds every 3-4 months, regardless of need.  Washington and Universal's owners agreed that, if questioned, both would say that this technician was her employee and that he was using her equipment, both of which were false, although Washington may have paid him something extra in addition to his Universal salary.  Patients were bussed in to her office and made to stay there all day, where they were run through absurd levels of ultrasound tests, an average of 36 ultrasounds in two years as calculated in the beginning of 2010 on more than three quarters of her patient population (more than any physician in this State), to the point where Washington was routinely billing for tests that should be extremely rare, like pelvic ultrasounds for men.  Washington also billed codes for these ultrasounds for both "expanded" and "limited" versions of the same tests and got paid for both.  The value of the equipment and tech as well as the amounts paid by Medicare to her directly for these ultrasound tests as a result of work actually performed by Universal were

9

additional incentives for her to continue to order outlier levels of harmful nuclear stress tests that were very lucrative for Universal.

11.     Because of the potential for patient harm and unnecessary cost that result from fee-splitting, the Medicare anti-Kickback Act and the Stark laws and regulations prohibit physicians from making a referral to an entity when it has a financial interest in the referral. There are limited exceptions to these rules with the burden of proof on the parties engaged in this financial relationship: the most fundamental requirements are that there be a written contract in place and the payment must be commercially reasonable apart from the payor's desire to increase a stream of referrals, and the payment must represent fair market value for that commercially reasonable purpose. Universal split fees with physicians for many years with no contract in place at all. As to those physicians with whom it did enter into a contract it denominated those payments as "Medicare supervision." It is important to explain that there are two different types of supervision that an independent diagnostic testing center must provide: a physician to generally supervise the facility to make sure that the equipment is calibrated and the technicians are trained etc. In order to do this, the physician supervisor must be approved by Medicare and proficient in the specific tests that are being conducted, but does not have to be physically present when the test is conducted. The second type of supervision applies to those subcategories of tests where a physician does have to be physically present in the facility: those where contrast media is being injected into the patient because of the danger of an allergic reaction, and those where the patient's heart is being stressed either through physical exertion or chemical stress, because of the danger of a heart attack or stroke. Because such dangers are real, but relatively unlikely, these tests do not require the physician to be in the room, only in the test facility. For the stress

10

tests in particular, Medicare will pay a physician essentially an on-call rate to be in the facility while the test is being conducted, with the payment per test being $26. While Universal hired physicians to read tests, it only rarely tasked any of the physicians it actually employed to perform supervision of contrast media injections or heart stress tests. This is obviously because it wanted to use payments for supervision to physicians in a position to refer patients to it as a method to increase referrals and needed some justification for the payments. Thus, Universal paid physicians $200 for "Medicare supervision" for this service for which Medicare pays $26. The entire value of the heart stress test to Universal is only around $100, and it is obviously not commercially reasonable for Universal to pay physicians $200 to supervise a test worth $100. The reason it did so is that for virtually every test, it tacked on an imaging component that made the entire test worth approximately $900 to it. Although this imaging component did not require physician presence, Universal nevertheless paid physicians $200 to obtain a total benefit of $900 and a benefit for itself of $700. As explained in the Declaration of Kathleen McNamara attached to my Declaration, this is not commercially reasonable because it is for an unlawful purpose, and $200 is not fair market value for a service for which Medicare pays $26.

12.     Universal also paid significant fees for "ultrasound" supervision to physicians who made referrals to it. Because ultrasounds do not involve injections of contrast media or any other possible emergency situation, ultrasounds are a type of test that do not require physician presence in the facility. The sole supervision requirement for ultrasounds is that there must be a physician employed by the independent diagnostic testing facility who is responsible for calibrating the equipment in general and training the technicians in general. Universal employed reading radiologists who could have performed this task without having to be present for the

11

actual tests. Instead Universal paid primary care physicians for Medicare supervision who had

no knowledge of ultrasounds, and did not and could not calibrate any equipment or train any

technicians. The sole reason it did so is that those physicians were in a position to make referrals

to it. As is set forth in the Declaration of Kathleen McNamara attached to my Declaration, these

payments were not commercially reasonable.

*Amount of the Debt*

13.     As stated above, virtually all of the referrals to Universal were infected by an

improper payment to a physician. From 2003-2008, we were able to document approximately

90% of the $7.8 million in Medicare monies paid to Universal as infected by payments that

Universal made to approximately 179 referring physician. The False Claims Act provides for

treble damages and a civil penalty of approximately $5,500 to $10,500 for each false claim that a

person or entity either submits to the government or causes to be submitted to the government.

31 U.S.C. §§ 3729-3733, *see* 31 U.S.C. § 3729(a)(1) (adjusted for inflation under the Federal

Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note; Public Law 104-410).

As explained above, claims submitted to Medicare that are infected by a kickback arrangement

and claims for payment for tests that have not been appropriately supervised are not payable.

Conservatively counting the claims at the lowest penalty end just through 2008, Universal owes

the United States $21 million in treble damages and $127.5 million in civil penalties for a total of

$148.5 million. Universal is liable for this debt and its owners and sole shareholders, Young and

Lauhoff, who either signed certifications that they would not submit such claims or had such

certifications signed on their behalf, who entered into the unlawful arrangements with the

physicians, who made false representations to Medicare or caused such false representations to

be made, caused the submission of these claims and are liable with Universal.

*Entitlement to a Prejudgment Remedy: "Reasonable cause to believe" that Defendants have "assign[ed], dispose[d, or] remove[d]" their property "with the effect of hindering, delaying, or defrauding the United States," or "has or is about to convert the debtor's property into money in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States."*

14.     Under the Federal Debt Collection Procedures Act, a prejudgment remedy may be granted "if the United States shows reasonable cause to believe that the debtor has *** assign[ed], dispose[d], [or] remove[d] *** property **with the effect of** hindering, delaying, or defrauding the United States," 28 U.S.C. § 3101(b)(1)(A); or "if the United States shows reasonable cause to believe that the debtor has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States **with the effect of** hindering, delaying, or defrauding the United States." 28 U.S.C. § 3101(b)(1)(C) (emphasis supplied). The United States may obtain a prejudgment remedy as to any of the debtors' property, assuming it has shown the probable validity of the debt, not just proceeds traceable to the fraud. As explained below, Universal is in the process of liquidating itself and fraudulently transferring assets and the two individual debtors, Lauhoff and Young, are in the process of disposing of their personal property, and the effect of all of these actions is to hinder, delay or defraud the United States.

15.     On June 21, 2011, counsel for Universal and Phillip Young agreed in writing to the terms of a settlement that would have involved a cash payment by Young and a consent judgment against Universal. Knowing that Universal could not pay the full debt to the United States, the parties had previously entered into a process in June 2010 suggested by counsel for

13

Universal which was supposed to be "completely transparent" to the government by which

Universal was to make full financial disclosure as a predicate to a settlement based on ability to

pay. On August 25 and 26, 2010, counsel for Universal provided us with sworn financial

statements representing that the assets of the firm were worth less than a security interest held by

TCF Bank. No other secured creditors were disclosed on the financial statements, and certain

intangible assets, called "certificates of need," were valued at $10,000. Relying on these sworn

financial statements, we entered into an agreement with Universal for entry of a consent

judgment rather than a cash payment since it did not appear that the company had the ability to

pay. The government would have been an unsecured creditor under the consent judgment, and

therefore the secured creditor, TCF Bank, would have been paid first from any liquidation or sale

of assets.

16.     Two facts were unknown to the government at the time: first, six days after

providing the government with sworn financial statements, counsel for Universal filed a

financing statement with the State of Michigan on behalf of another company owned by Phillip J.

Young, owner of Universal, called MRI Leasing LLC, creating a new security interest in all of

Universal's assets. Second, the certificates of need valued at $5,000 each by Phillip Young's

sworn financial statement were actually worth over $1 million. *See* Declaration of Rodney

Crawford attached to this Declaration.

17.     As explained in the Declaration of Rodney Crawford, attached hereto, Universal

Imaging, Inc. was set up initially improperly as a for-profit corporation and was forced by the

State of Michigan to reincorporate as a nonprofit corporation in 2006. It never operated as a

compliant nonprofit, however, and its owner, Phillip Young, seeking to maintain his ability to

14

obtain personal profit from this ostensible nonprofit, caused the transfer of all of Universal's equipment to a shell company, MRI Leasing LLC. MRI Leasing LLC has no independent existence; it has no employees and was housed at the same location as Universal. Young then caused Universal to pay large amounts of "rent" to MRI Leasing for its own equipment, and then took his distributions of over $1 million from MRI Leasing instead of from the now non-profit Universal. Various financial mechanisms were created to make this look like a legitimate transaction on the corporation's books, but the most basic element, approval by a nonprofit board of directors for this transaction, is entirely absent since there is no such board of directors for Universal. Furthermore, MRI Leasing "paid" for this equipment by taking out a loan from TCF Bank; but it made Universal the co-debtor on the loan and counsel notified us on December 23, 2011, that on January 5, 2012, MRI Leasing and Universal will sell Universal's major asset in order to pay off that loan. In other words, Universal purchased assets, transferred them to MRI Leasing in return for a debt obligation that Universal itself is now about to pay. Further, Universal has for the last five years owed substantial "rent" to MRI Leasing for leasing its own equipment, rent that MRI Leasing appears now to have secured through a security interest that Universal will use to justify the transfer to MRI of any of Universal's assets left after Universal pays back MRI's debt to TCF Bank.

18.    Apparently counsel for Universal initially thought that the mere filing of the undisclosed new security interest on behalf of MRI Leasing LLC would ensure that the government would never get any recovery from the liquidation of the corporation, accounting for his initial approval of the settlement in June 2011. At some point thereafter there must have been some concern that the government would be able to avoid this transfer because Universal had

15

never disclosed the security interest and/or because it is fraudulent.  Accordingly, on the Friday

before Thanksgiving, November 18, 2011, counsel for Universal called the office of the U.S.

Attorney and said that Universal had a "home health agency buyer" for an undisclosed asset and

that the buyer would not complete the purchase unless the government approved the sale in

writing.  Specifically, counsel insisted that the government had to put into writing by Monday,

November 21, one business day later, that it had no objection to any disbursements to "secured

creditors."  Counsel stated we had to agree to this precise language and that without our

immediate agreement, the settlement agreement that he and Young/Universal had agreed would

be void.  When we asked counsel, on November 21, which secured creditors he was talking about

other than TCF Bank, he responded, "some imaging company."  In fact, there was no "home

health agency buyer," there was no requirement by any buyer that the government put any such

thing in writing, and "some imaging company," as counsel well knew, was actually MRI Leasing

LLC, Young's own company and counsel's own  client.  In other words, counsel attempted to

mislead us into an unknowing approval of a fraudulent transfer of assets to a shell company

ostensibly to pay for "rents" for Universal's own equipment, from which point they could be

redistributed to Young.  When in response we stated in writing that we had no objection to the

sale and distribution of assets to TCF Bank and forwarded a new version of the settlement

agreement making that clear, counsel responded by email, "Mr. Young  nor myself agreed  to the

terms of the purported settlement agreement provided today or your letter dated November 22, 2011. We

do not have a settlement and this matter will have to be litigated.  There is no need for any further

discussions."

     19.    Because of this turn of events, the management of the U.S. Attorney's office took

the extraordinary step of notifying the management of counsel's firm, the law firm Giarmarco,

Mullins & Horton PC, of these representations in an attempt to avoid having to disclose all of

this in the course of litigation. In response, on November 28, counsel offered to put the proceeds

of the impending sale of the intangible assets for over $1 million into a separate account "until

this dispute is resolved." The government agreed to this proposal assuming that all proceeds

from any sale or lease, beyond those owed to TCF Bank, would be placed into a third party

escrow account. On December 13, we asked counsel by letter to confirm this agreement by

Friday, December 16. No confirmation was received. On December 19, we again asked counsel

to confirm this agreement, and he stated that he would respond by December 20. No response

was received. On the afternoon of the Friday before the Christmas weekend, counsel emailed a

letter in which he stated that the firm was going to close on the deal for its most valuable asset on

January 5, 2012 and would thereafter proceed to liquidate itself and presumably transfer its assets

to Young through MRI Leasing LLC. No response as to the question of an escrow account was

provided. We then asked counsel for the third time whether he was withdrawing the prior offer

to place the proceeds of these sales and leases into an escrow. Counsel responded that he was

"awaiting an email" on the matter from Mr. Young, and that even if Young agreed, "he would

want some type of time limit on the monies being in escrow, such as 30 days. After that time,

unless there was some type of court order the monies would be disbursed." At 5:02 pm on

Friday, December 23, counsel emailed again to say that Mr. Young would agree to his own

proposal of November 28 only on these new terms. Since this litigation cannot be resolved

within 30 days and since the government in any case has no trusted partner with which to

negotiate such an agreement based on the above, we seek the assistance of the Court in protecting

17

these assets.

20.     In addition to the disposition of Universal's assets, assets of both Young and Mark Lauhoff have been disposed of or placed on the market while they have ostensibly been negotiating a settlement.  According to public records, in 2011 Mark Lauhoff or his bank lender sold 3625 Wards Point Drive in Orchard Lake MI 48324 for $942,840.  Another property that he owned has been twice listed for sale in 2011, 19107 Chelton Drive, Beverly Hills, 48025.  Also in 2011, Phillip Young sold 1827 Brookview Drive in Saline, Michigan for $625,000.  The whereabouts of any proceeds beyond any mortgage are unknown to us.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Steve Rinaldi

Dated: December 27, 2011

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ex rel. RICHARD CHESBROUGH, M.D., ) | |
| and KIM CHESBROUGH, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | CIVIL NO. 06-15638 |
| ) | HON.   JOHN CORBETT O'MEARA |
| ) | MAG. JUDGE VIRGINIA M. MORGAN |
| ) | |
| UNIVERSAL IMAGING, INC., ) | |
| MRI LEASING, LLC, d/b/a PREMIER ) | |
| LEASING AND MANAGEMENT ) | |
| SERVICES, LLC, PHILLIP J. YOUNG, ) | |
| MARK LAUHOFF, and GWENDOLYN ) | |
| WASHINGTON, Jointly and Severally, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| TCF BANK, ) | |
| TCF INVESTMENTS, ) | |
| JP MORGAN CHASE, ) | |
| FIFTH THIRD BANK, ) | |
| CHASE BANK, ) | |
| COMERICA BANK, ) | |
| GREGORY SCHWARTZ & CO. INC. ) | |
| ) | |
| Garnishees. ) | |
| _____) | |

**DECLARATION OF RODNEY L. CRAWFORD**

1.      I am the managing member of Crawford & Winiarski, a d/b/a for Crawford

Financial Consulting LLC, which is a Detroit-based firm engaged  in investigative accounting,

economic  damages  analysis  and  financial  consulting  in  the  context  of  fraud  investigations,

business valuations, commercial disputes and troubled company situations.   I was retained by the

United States to evaluate the financial statements provided by Phillip J. Young and various business entities that he owns or controls,  including Universal Imaging, Inc. and MRI Leasing, LLC.  Specifically, I was asked to determine Universal Imaging's ability to pay a debt to the United States, as well as the financial relationships among Young, Universal Imaging, Inc. and MRI Leasing, LLC.  Crawford & Winiarski's work on this matter was performed by me and others working under my direct supervision. This declaration  contains my conclusions and opinions on these issues based on my review of the financial statements and other financial information disclosed to date by Phillip J. Young, the sole owner of both Universal and MRI Leasing.

2.      I have 32 years of experience as a Certified Public Accountant in Michigan, including 25 years with Arthur Andersen LLP, following which I founded Crawford & Winiarski in 2002.  I am Certified in Financial Forensics ("CFF") and Accredited in Business Valuation ("ABV") by the American Institute of Certified Public Accountants and am also a Certified Fraud Examiner ("CFE").  I am currently the Vice Chairman of the Michigan Association of CPAs Litigation Consulting Task Force and formerly was Chairman of the Michigan Association of CPAs Fraud Task Force. Over the last 26 years, I have served as a consultant or expert in hundreds of matters involving forensic accounting investigations and claims of economic damages in connection with commercial disputes.  I have been qualified as an expert and provided expert testimony on many occasions in federal and state court and arbitration proceedings and am a panelist on the American Arbitration Association commercial arbitration panel.

3.      Sworn financial statements for Universal Imaging, Inc. and Phillip J. Young were provided to the United States on August 25 and 26, 2010.   Those financial statements disclosed a

2

large debt to a single secured creditor, TCF Bank.   Supplemental documentation was later provided at the government's request.   The assets disclosed appeared to be insufficient to satisfy that debt based on the valuations provided by Young and Universal.   I was able to validate the values placed on the equipment and they appeared to be approximately correct.   Young and Universal also listed intangible assets – certificates of need for equipment – that are in the nature of licenses for which there is little source of market value information.   Young and Universal valued those assets at $5,000 each.   With no ready source of valuation information for these licenses, I was instructed to take these valuations at face value.   Based on the information in the financial statements, I concluded that Universal could not afford to pay a substantial debt to the United States.

4.      Unknown to me, the certificates of need had been valued by Young and Universal at approximately 1% of their actual value.

5.      Also unknown to me, or to the United States, six days after Young had provided these sworn financial statements in August 2010, his counsel filed a financing statement on behalf of Young's company MRI Leasing, LLC with the State of Michigan, claiming that MRI Leasing, LLC  had a security interest in all of Universal's assets.   No security agreement justifying that financing statement or other evidence of any underlying debt has been provided to me.

6.      The United States has asked me to evaluate the operations of Young, Universal and MRI Leasing LLC under the alter ego standards set forth in *U.S. v. Walton*, 909 F.2d 915, 918 (6th Cir. 1990). Specifically, the United States has asked me whether (1) there is an absence of normal corporate formalities in the operations of Universal and MRI Leasing, (2) whether there has been a siphoning of corporate funds by a dominant stockholder, and (3) whether the corporations are

merely a facade for the personal operations of the dominant stockholder, *i.e.*, Young.   I evaluate each of the criteria below based on the facts available to me.

      7.   *Absence of normal corporate formalities.*

          A.   Universal was originally formed as a Michigan for-profit corporation, reporting income for Federal taxation purposes as a flow-through S Corporation on Form 1120-S. The State of Michigan thereafter informed Universal that as a medical services provider other than a physician-owned corporation, it was not permitted to be organized as a for-profit corporation. On December 31, 2005, Universal adopted and filed Restated Articles of Incorporation converting itself to a nonprofit corporation under the Michigan Nonprofit Corporation Act, Act 162 of 1982. However, in my opinion, based on the information provided to me, Universal has never operated as a compliant nonprofit.   A Michigan nonprofit corporation must be controlled by a Board of Directors comprised of at least three people, which is not the case with Universal.   Universal has provided no evidence of the corporate governance procedures that would be required of a nonprofit corporation. On the contrary, the company appears to have been controlled by its two owners, Mark Lauhoff and Phillip Young, until 2007, and thereafter by Phillip Young alone. Although I am not aware of any legal requirement that a Michigan nonprofit corporation seek to obtain federal tax-exempt status, it is significant that Universal never attempted to do so, since applying for tax-exempt status would have required it to disclose information that would have revealed that it was not actually operating as a nonprofit.   Universal has continued to file its Federal tax returns on Form 1120S, with taxable income flowing through to its stockholders, and continued payment of distributions to stockholders, specifically to Lauhoff and Young. This would never be appropriate for a lawfully operating nonprofit entity, where by definition income is

not to be distributed for the benefit of officers, directors or stockholders.

    B. After changing its formal status as required by the State of Michigan from for-profit to non-profit, Universal entered into a series of transactions with MRI Leasing LLC in 2006 that are not consistent with any arms-length dealing between independent corporations and that resulted in the transfer of substantially all of Universal's tangible equipment assets to MRI Leasing LLC in return for a note payable.   At that time both MRI Leasing and Universal were jointly owned 50/50 by Phillip Young and Mark Lauhoff.   The Universal and MRI accounting records show that for the first three months of 2006, Universal was leasing its equipment **to** MRI. However, in March 2006, the companies reversed all of those transactions, with MRI purchasing, retroactive to January 1, 2006, all of the equipment and other physical assets previously owned by Universal for approximately $1,312,000 in exchange for a "related party payable" to Universal. This transaction appears to have been recorded at the approximate book value of Universal's assets.   To my knowledge, no analysis of the actual market value of this equipment or the fairness of this transaction to Universal was performed, or if such an analysis was performed, it was not provided to the United States by Young or Universal.   Nor was I provided with any evidence of consideration or approval of these transactions, involving nonprofit and for profit entities under common control, by the Board of Directors that one would expect to see in a legitimate nonprofit entity.   As stated, there is no evidence that such a Board of Directors has ever existed.

C.      MRI Leasing LLC immediately leased the assets previously owned by Universal back to Universal, again retroactive to January 1, 2006.   This shift resulted in Universal changing from owner/lessor to lessee on its most significant assets, with MRI earning significant rental income from Universal as a result.

D.      In early 2006, MRI Leasing took out a new loan from TCF Bank in the amount of approximately $800,000 to pay Universal in part for the equipment transferred to it from Universal.   However, the loan agreement provides that both MRI Leasing and Universal are jointly the "Borrowers" and TCF Bank took a security interest in the assets of both MRI Leasing and Universal to secure the debt.   Universal disclosed to the United States on December 23, 2011, that it intends to sell its main assets, the certificates of need required to operate host MRI sites in Auburn Hills and Troy, with a closing date of January 5, 2012.   The buyer under an Asset Purchase Agreement is North Oakland North Macomb Imaging Inc. ("North Oakland"), a joint venture between three area hospitals. The price for the intangible assets is $1,115,000, and it is specified that of this amount, $806,000 would be transferred directly to repay the TCF Bank debt. In other words, it is actually Universal that is now paying for the equipment that MRI Leasing "purchased" from it, and in addition has paid large amounts of "rent" to MRI Leasing LLC for its own equipment.   It is significant that TCF Bank saw MRI Leasing and Universal as essentially the same entity in issuing this loan, and in my opinion, this transaction was not commercially reasonable from the standpoint of Universal and this series of transactions is not consistent with any arms-length dealing between independent corporations.   The effect of this series of transactions is the dominant shareholder, Young, obtaining profit from the ostensible "non-profit" Universal, by transferring its resources out of the non-profit corporation and into a for-profit entity

6

that Young controls.

        E.     Through March 2010, Universal owed MRI Leasing approximately $4.2 million in lease payments, although adjustments were made in the approximate amount of $1.3 million crediting Universal mostly in year-end adjustments through 2010. The basis for the adjustments is not clear from any of the financial records available to me. These adjustments provide further evidence that these lease payments were not established through any arms-length transaction.

        F.     Part of Universal's impending Asset Purchase Agreement with North Oakland North Macomb Imaging Inc. involves a payment to Universal of $286,000 for the part-time use of "Seller's Mobile MRI" for one year following the closing of the transaction. Since Universal, the "Seller", does not appear to own a Mobile MRI, this appears to be a reference to MRI Leasing's unit, again evidencing a commingling of the business of the two Young companies.

        G.     In my opinion, this series of transactions, including the sale-leaseback of all of Universal's tangible assets and the TCF Bank loan transaction, are not transactions commercially reasonable for parties operating at arms-length, and are manifestly unreasonable behavior from an ostensible nonprofit corporation. As stated, none of the expected corporate formalities appear to be present, including any evidence of the required three-member Board of Directors approving any of these agreements, all of which are to the detriment of Universal and to the advantage of MRI Leasing LLC and its now 100% owner, Young.

     8.   *Siphoning of Corporate Funds by a Dominant Stockholder*

        A.     Substantial financial gain has flowed from Universal to Phillip Young (and

in 2006 his former partner, Mark Lauhoff) in the form of owner distributions from MRI Leasing LLC, which in turn were primarily the product of lease payments paid to MRI Leasing by Universal.   The MRI Leasing LLC general ledger through March 2010 shows cash distributions of $1,442,997 to Young and $240,000 to Lauhoff (who sold his interest to Young in 2007), all after the date at which Universal purported to become a nonprofit and entered into the sale-leaseback of all of its physical assets with MRI Leasing.

B.      Young also caused MRI Leasing to pay another $315,000 in 2007 and 2008 to a third company 100% owned by Young, Medical Parts Exchange, Inc., identified as "Management Services 2007" and "PY Consulting."

C.      As stated above, Universal recently disclosed to the United States that it intends to sell its main assets, the certificates of need required to operate host MRI sites in Auburn Hills and Troy, and use the proceeds in part to pay the MRI Leasing LLC debt incurred to purchase Universal's equipment.   As stated above, the TCF Bank debt was incurred entirely for the benefit of MRI Leasing, LLC, although Young secured this debt with the assets of Universal.   This transaction represents a further distribution of Universal's assets for the benefit of its stockholders.

9.   *Corporations are Merely a Facade for Operations of Primary Shareholders*

A.      MRI Leasing LLC has no compensated employees.   It operated from Universal Imaging's business location.   It thus appears that Universal has been bearing the costs of operating MRI's business.

B.      Based on my evaluation of the financial documents provided by Young and Universal set forth above, I have identified substantial evidence that Universal Imaging, Inc. has not acted in a commercially reasonable manner, and substantial evidence, therefore, that the

8

corporate form is being used by the primary shareholder as a facade for operations that will profit his other for-profit ventures and himself personally.

*Summary*

10.     Based on my evaluation of the financial documents provided by Young and Universal, I have identified substantial evidence that the three criteria identified in paragraph 6 are met.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief, based upon the financial information provided by Universal Imaging, Inc. and Young and reviewed by my firm.

Dated this 27th day of December, 2011.

Rodney L. Crawford, CPA/ABV, CFF, CFE

9

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. RICHARD CHESBROUGH, M.D., | ) | |
| and KIM CHESBROUGH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CIV. No. 5:06-cv-15638-JCO-VMM |
| | ) | HON.   JOHN CORBETT O'MEARA |
| | ) | MAG. JUDGE VIRGINIA M. MORGAN |
| | ) | |
| UNIVERSAL IMAGING, INC., | ) | |
| MRI LEASING, LLC, d/b/a PREMIER | ) | |
| LEASING AND MANAGEMENT | ) | |
| SERVICES, LLC, PHILLIP J. YOUNG, | ) | |
| MARK LAUHOFF, and GWENDOLYN | ) | |
| WASHINGTON, Jointly and Severally, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TCF BANK, | ) | |
| TCF INVESTMENTS | ) | |
| JP MORGAN CHASE | ) | |
| FIFTH THIRD BANK | ) | |
| CHASE BANK | ) | |
| COMERICA BANK | ) | |
| GREGORY SCHWARTZ & CO. | ) | |
| | ) | |
| Garnishees. | ) | |
| _____ | ) | |

DECLARATION OF KATHLEEN MCNAMARA

I, Kathleen McNamara, declare as follows:

1.      I   am a certified public accountant with the firm Myers & Stauffer LC.   I have

25 years of experience in the healthcare industry, including five years' experience as treasurer of

a national health care company specializing in home health care, and eight years' experience

managing a healthcare-related consulting department at Mayer Hoffman McCann, LLC.   For the past twelve years, my work has focused on Medicare and Medicaid compliance issues including the healthcare anti-kickback and Stark laws and regulations, specifically, the reasonableness of physician compensation, fair market value examinations, and the evaluation of commercial reasonableness of particular contractual arrangements among healthcare providers.   I have been qualified as an expert in federal court and testified as well as provided expert reports on fair market value and commercial reasonableness issues arising under the Stark and anti-kickback laws and regulations in numerous cases.

2.      I was asked by the United States Attorney's Office for the Eastern District of Michigan to evaluate the payments made by an independent diagnostic testing company called Universal Imaging, Inc. to physicians who made referrals to Universal Imaging, Inc. for diagnostic tests.   Specifically, I was asked to evaluate the fair market value and commercial reasonableness of payments made by Universal Imaging, Inc., to physicians.   To conduct this review I evaluated documentary evidence produced by Universal under a federal subpoena for the existence of a contractual relationship with physicians to whom they were paying monies, as well as Universal's internal documentation showing what services Universal had provided to patients of those physicians and the payments made by Universal to the physicians.

3.      The most basic prerequisite to any finding of fair market value and commercial reasonableness under both the anti-kickback and Stark laws and regulations is that the entity paying money to a physician and that physician must have a written contract.   For many of Universal Imaging's relationships where physicians were referring patients to Universal and Universal was paying money to the physicians, there was no such contract.

2

4.      For those relationships where at some point there was an executed contract, the question of fair market value and commercial reasonableness of payments by an entity to physicians who are making referrals to the entity must be evaluated in the context of the regulatory framework applicable to that entity.   In the case of an independent diagnostic facility like Universal Imaging, Medicare requires medical supervision by a physician, with the amount and type of supervision depending on the type of diagnostic test that the entity is conducting. Certain tests that could create a medical emergency require a physician to be available in the office suite where the test is being conducted.   These include, in the case of tests conducted by Universal Imaging, Inc., tests involving injections of contrast media for MRIs and CT scans which may cause an allergic reaction, or cardiac stress tests which may bring on a heart attack. Medicare has established qualification requirements for supervision of each of these types of tests and requires that all supervising physicians for an independent diagnostic testing facility like Universal to be disclosed to Medicare and approved by it.   In addition to this type of physician supervision of patients who could have dangerous reactions to particular types of tests (called "direct supervision"), Medicare has separate physician supervision requirements applicable to the technicians who conduct the tests and their equipment.   Medicare requires independent diagnostic testing facilities to have appropriately qualified physicians making sure that the equipment being used for particular types of tests is in working order, and that the technicians are appropriately trained and are conducting the tests in a professional manner.   This distinct type of supervision (called "general supervision"), does not require the physician to be on site when the tests are being conducted.   The identities and qualifications of these physicians also must be disclosed to Medicare and approved.

3

5.     The vast majority of the payments that Universal was making to physicians under any contract were called by it "supervision" fees, but few if any of the physicians to whom they were paying such fees had been disclosed or approved by Medicare.   Moreover, many of these physicians, even if they had been disclosed to Medicare, would not have been approved as supervisors because they were not qualified based on my review of the requirements set forth by the Michigan Medicare contractor.    For such physicians, who, even if they performed supervision, had not been qualified to perform the supervision or could not have been qualified, the fair market value of any payments is zero, and it was not commercially reasonable for Universal to pay these physicians for conducting Medicare supervision.

6.     Even if, contrary to fact, any of these physicians had been approved by Medicare to conduct supervision, the amounts that Universal was paying to these physicians was not fair market value and was not commercially reasonable.   In the case of supervision of stress tests, for example, Medicare rules require a physician to be located in the office suite where the test is conducted and thus available in case of emergency;   Medicare does not require that a physician be present in the room.   Physicians who operate stress tests in their own offices, like cardiologists, are paid by Medicare directly for this type of supervision.   The amount that Medicare pays for supervision is essentially the "on-call" rate for having a physician available, approximately $26 per test.   Universal Imaging was typically paying physicians $200 for exactly this same service.   Medicare pays only a total of about $100 for the complete stress test, including supervision.   The only reason Universal Imaging would pay $200 for supervising a test worth $100 to it was to ensure a stream of referrals for another, expensive imaging component attached to the stress test that did not require physician on-site supervision.   With

4

that additional imaging component, Universal Imaging was able to obtain reimbursement of approximately $900 per test.   It is only in the context of an unlawful purpose to ensure a stream of referrals to it of tests worth $900, that it makes any business sense for Universal to pay $200 for "supervision."   Apart from this invalid reason of ensuring this stream of referrals from physicians, this arrangement is not commercially reasonable and the payments are not fair market value.

       7.     In 2007, Universal changed the payment method in some of its contracts with physicians, where it was sending mobile testing units to those physicians' offices, to make it appear that it was paying physicians based on time in their facility:   i.e., by quarter day, half day, three quarter day and full day.   But the contractual definition of what was considered to be a "quarter day" was not actually defined as time in the facility, but instead was defined as a certain number of tests performed there.   Monies exchanged thus continued to be based on the number of referrals notwithstanding this change in language.   Physician supervision continued to be a major component of most of these payments.   Some of the payments are characterized as, in part, "rent," but the amounts paid as rent do not differ between locations with markedly different rental rates, nor do they differ based on the size of any exam room provided for Universal to conduct these exams.   The Stark and anti-kickback Act laws and regulations allow for fair market value rent to be paid but require there to be an arms-length negotiation with amounts paid reflecting fair market value for space or services.   My evaluation of the amounts supposedly paid as rents paid demonstrates that   in general there was no such arms-length negotiation and that the amounts paid were set in advance by Universal Imaging to be approximately equivalent to the amounts that they had paid previously for pure supervision.

The rents, moreover, were substantially above fair market value for comparable space and facilities.

    8.    As set forth above, in those cases where Universal and the physician entered into a contract, the underlying goal appeared to be to split insurance revenue between Universal and the physician in order to induce the physician to continue to provide a stream of referrals to Universal, and to provide sham contractual language making it appear that the physician had provided some service or good to Universal justifying the payment.    Many of the contracts provided that Universal could obtain the revenue from the insurance company and then split it with the physician, or the physician could obtain the revenue and then split it with Universal. Who would get the monies in the first instance from the insurance company, was made wholly dependent on what type of insurance the patient carried.    The fact that there was not even any fixed lessor or lessee in these contracts provides further support for the proposition that these contracts were shams designed to provide cover for the very type of unlawful exchanges of money for patients that the anti-kickback and Stark laws and regulations were designed to prohibit.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Executed this 21st day of December, 2011, Johnston, Iowa.

Kathleen McNamara