UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA, )
ex rel. RICHARD CHESBROUGH, M.D., )
and KIM CHESBROUGH, )
) Case No.: 5:06-cv-15638
Plaintiffs, )
) Hon. John Corbett O'Meara
vs. )
)
UNIVERSAL IMAGING, INC., )
MRI LEASING, LLC, d/b/a PREMIER )
LEASING AND MANAGEMENT )
SERVICES, LLC, PHILLIP J. YOUNG, )
MARK LAUHOFF, and GWENDOLYN )
WASHINGTON, Jointly and Severally, )
)
Defendants, )

**DEFENDANTS UNIVERSAL IMAGING, INC., MRI LEASING, LLC, d/b/a PREMIER LEASING AND MANAGEMENT SERVICES, LLC, AND PHILLIP J. YOUNG'S MOTION TO QUASH PREJUDGMENT REMEDIES**

NOW COME Defendants Universal Imaging, Inc., MRI Leasing, LLC d/b/a Premier Leasing and Management Services, LLC and Phillip J. Young, and for their Motion to Quash, state as follows:

1. This case involves alleged violations of the False Claims Act, 31 U.S.C. §§ 3729-3733. The action was originally filed on 12/19/06 by *qui tam* relators. (See Docket No. 19). The United States intervened, and filed a Complaint on 12/29/11. (Docket No. 25).

2. Defendants have cooperated with the government over the past two years trying to resolve this matter, and have given the government the information (nearly fifteen thousand pages of documents) it has requested. (See Brief, below).

3.      Despite this fact, in addition to filing a Complaint, on 12/29/11, the United States filed an Application *In Camera* under the Federal Debt Collection Procedures Act (28 U.S.C. § 3001 et. seq.) for Pre-Judgment Garnishment and Other Remedies. (Docket No. 27).

4.      Due to the fact that the government failed to comply with the requirements of the Federal Debt Collection Procedures Act, and for the reasons more fully described in the accompanying brief, the prejudgment remedies granted to the government should be quashed.

WHEREFORE, Defendants respectfully request that this Honorable Court grant their Motion to Quash prejudgment remedies or in the alternative appoint a third party monitor to monitor all business transactions in order to adequately protect Plaintiff's interests.

/s/ Ben M. Gonek
Ben M. Gonek  (P43716)
Giarmarco, Mullins, & Horton, P.C.
Attorney for Defendants
101 West Big Beaver, 10th Floor
Troy, Michigan 48084
(248) 457-7152
bgonek@gmhlaw.com
P43716

Dated:  February 14, 2012

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA, )
ex rel. RICHARD CHESBROUGH, M.D., )
and KIM CHESBROUGH, )
) Case No.: 5:06-cv-15638
)
Plaintiffs, )
) Hon. John Corbett O'Meara
vs. )
)
UNIVERSAL IMAGING, INC., )
MRI LEASING, LLC, d/b/a PREMIER )
LEASING AND MANAGEMENT )
SERVICES, LLC, PHILLIP J. YOUNG, )
MARK LAUHOFF, and GWENDOLYN )
WASHINGTON, Jointly and Severally, )
)
Defendants, )

### BRIEF IN SUPPORT OF DEFENDANTS UNIVERSAL IMAGING, INC., MRI LEASING, LLC, d/b/a PREMIER LEASING AND MANAGEMENT SERVICES, LLC, AND PHILLIP J. YOUNG'S MOTION TO QUASH PREJUDGMENT REMEDIES

NOW COME Defendants Universal Imaging, Inc., MRI Leasing, LLC d/b/a Premier Leasing and Management Services, LLC and Phillip J. Young ("Defendants"), and for their Brief in Support, state as follows:

### INTRODUCTION AND STATEMENT OF FACTS

*Qui tam* Relators Richard and Kim Chesbrough[1] instituted this action on 12/19/06 for alleged violations of the False Claims Act, 31 U.S.C. §§ 3729-3733

---

[1] This is not the first time Richard and Kim Chesbrough have instituted a *qui tam* action. In fact, the 6th Circuit Court of Appeals recently upheld the district court's dismissal of a *qui tam* action initiated by Richard and Kim Chesbrough based on the False Claims Act. The Court of Appeals held that the Chesbroughs failed to identify that any fraudulent claim was submitted to the government. See *Chesbrough v VPA. P.C.*, 655 F.3d 461 (2011).

3

("FCA"). (See Docket No. 19). The government has been conducting an investigation into Defendants since the initiation of this action, over five years ago.

On 12/29/11, the United States intervened, and filed a Complaint. (Docket no. 25). Before filing the Complaint, the United States filed an Application *In Camera* under the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 et. seq. ("FDCPA") for prejudgment garnishment "and other remedies." (Docket No. 27; hereafter "Application"). The FDCPA allows, in part, the United States to obtain prejudgment remedies when it appears a Defendant is "about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States." 28 U.S.C. § 3101(b).

For the past several years, Defendants have cooperated with the United States government in its investigation. No attempts were made by Defendants to "hide" assets or otherwise take any actions that would jeopardize the United States' recovery in the event it proved its claims against Defendants. In fact, at one point during the investigation, Defendants willingly agreed not to dispose of any major assets without prior approval from the United States. During the entire course of the investigation, Defendants have provided the government with notice of all major asset sales, and at no point did the government attempt to seize any assets.

Shortly before the government filed its Complaint and Application, the parties reached a verbal settlement agreement. As part of the agreement, the government would allow for the orderly liquidation of Universal Imaging, Inc.'s assets. Universal Imaging, Inc. would then be allowed to pay off its secured creditors. One of the secured creditors of Universal Imaging, Inc. is Co-Defendant, MRI Leasing, LLC.

MRI Leasing, LLC is a stand-alone limited liability company. It is not a "shell" company as alleged in the government's application.[2] The only commonality between MRI Leasing, LLC and Universal Imaging, Inc. is that they share a common owner (co-Defendant Phillip Young), and MRI Leasing, LLC leases imaging equipment to Universal Imaging, Inc. (as well as many other companies). For further discussion regarding MRI Leasing, LLC, see Section (II)(C), below.

As indicated, Defendants have given the government the benefit of full disclosure during the course of its investigation. In fact, Defendants put the government on notice of a contemplated asset sale between Universal Imaging, Inc. and North Oakland North Macomb Imaging, Inc. (the same asset sale that the government argued in its Application would place Universal Imaging, Inc.'s assets beyond reach). After providing the government with details regarding the proposed sale, **Defendants willingly offered to place the proceeds of the sale into escrow.** The government has not, and cannot, show there is any danger or prejudice to them that would justify imposition of prejudgment remedies.

In addition to the foregoing, the government failed to comply with the statutory requirements for the issuance of the prejudgment remedy that was granted, and accordingly, this Court should quash the Order.

---

[2] It appears it is under that basis that the government seeks to hold MRI Leasing, LLC liable for the allegedly false claims submitted by Universal Imaging, Inc. A shell company is "a company or corporation that exists without assets or independent operations as a legal entity through which another company or corporation can conduct various dealings." See "Shell". *Merriam Webster Dictionary* (2011).

## LAW AND ARGUMENT

I.  **Background**

The FDCPA provides the exclusive civil procedure allowing the United States "to obtain, before judgment on a claim for a debt, a remedy in connection with such claim." 28 U.S.C. § 3001(a)(2). Section 3101(a) of the FDCPA provides:

> (1) The United States may, in a proceeding in conjunction with the complaint or at any time after the filing of a civil action on a claim for a debt, make application under oath to a court to issue any prejudgment remedy.
>
> (2) Such application shall be filed with the court and shall set forth the factual and legal basis for each prejudgment remedy sought.
>
> (3) Such application shall - -
>
>> (A) state that the debtor against whom the prejudgment remedy is sought shall be afforded an opportunity for a hearing; and
>>
>> (B) set forth with particularity that all statutory requirements under this chapter for the issuance of the prejudgment remedy sought have been satisfied.

In summary, the FDCPA provides the United States government with the chance to obtain prejudgment remedies if an application is filed in accordance with the provisions of the FDCPA. In part, the application must "set forth with particularity" the statutory requirements. *See* FDCPA § 3101(a)(3)(B).

In addition to filing an application, the government must file with the application an affidavit "establishing with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application." FDCPA § 3101(c)(1). The application

GIARMARCO, MULLINS & HORTON, P.C.
ATTORNEYS AND COUNSELORS AT LAW
Tenth Floor Columbia Center ▼ 101 West Big Beaver Road ▼ Troy, Michigan 48084-5280 ▼ P: (248) 457-7000 ▼ F: (248) 457-7001 ▼ www.gmhlaw.com

must state the specific amount of the debt claimed by the United States and one or more of the grounds specified in subsection (b).[3]

A debtor's remedies when faced with prejudgment remedies are set forth in § 3101(d)(2). This section states that "[b]y requesting, at any time before judgment on the claim for a debt, the court to hold a hearing, the debtor may move to quash the order granting such remedy." The statute provides that the court must hold a hearing within five days after receiving the request, or as soon thereafter as possible. FDCPA § 3101(d)(2). The issues to be ruled upon at the hearing are:

> (A) the probable validity of the claim for the debt for which such remedy was granted and of any defense or claim of exemption asserted by such person;
>
> (B) compliance with any statutory requirement for the issuance of the prejudgment remedy granted;
>
> (C) the existence of any ground set forth in subsection (b); and
>
> (D) the inadequacy of alternative remedies (if any) to protect the interests of the United States.
>
> 28 U.S.C. § 3101(d)(2).

---

[3] Subsection (b) of § 3101 provides that a prejudgment remedy may be granted if the United States "shows reasonable cause to believe that" the debtor:

> (A) is about to leave the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States in its effort to recover a debt;
>
> (B) has or is about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States;
>
> (C) has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States; or
>
> (D) has evaded service of process by concealing himself or has temporarily withdrawn from the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States…

For the following reasons, the government has failed to comply with the statutory requirements for issuance of the prejudgment remedy. Therefore, the prejudgment relief granted to the government should be quashed.

II.  **Government's Failure to Comply With Statutory Requirements**

   A.  **Failure to Comply With Oath Requirement**

28 U.S.C. § 3101(a)(1), the statute that allows the government to file the Application for prejudgment remedies, states that the Application must be made "under oath". In this case, the Application was signed by Assistant United States Attorney Joan Hartman in violation of this requirement.

This issue was discussed in *United States v Teeven*, No. 92-418 (LON), 1992 U.S. Dist. LEXIS 22191 (D. Del., Aug. 14, 1992). In *Teeven*, the government's application was not made under oath. Counsel for the government argued that because affidavits were submitted with the application, there was no reason that the application itself needed to be made under oath. The government also argued that every certification by government counsel "is an implicit representation as to the accuracy of the information..." and therefore no separate oath requirement should be imposed. The Court disagreed, holding that **"the plain language of the statute imposes a requirement for the application to be made under oath that is distinct from the oath required when making an affidavit."** *Id* at 10. Further, although the government argued the oath requirement was "pointless", the court stated that "[n]either this Court nor the United States Attorneys are in a position to legislate the language out of the statute." *Id* at 14. The Court held that **the government, by not signing its application under oath, had in fact failed to comply with the statutory**

**requirements.** *Id* at 11. The Court acknowledged that the failure to comply may have been *de minimis*, but because of the other deficiencies, the prejudgment remedies granted to the government were quashed. *Id*.

In the case at bar, like in *Teeven*, the government failed to make an application *under oath*, and the remedies granted in response to the government's improper application should be stricken accordingly.

B.     **Failure to Provide Adequate Affidavits**

Section 3101(c) of the FDCPA states that an application must include an affidavit "establishing with particularity" the facts supporting the "probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application." 28 U.S.C. § 3101(c)(1). The affidavits submitted in conjunction with the government's application do not come close to satisfying the particularity requirements of the statute.

In *Teeven, supra*, the affidavit submitted with the application listed a number of items that were relied upon by the declarant when making averments. Among the items were declarant's review of land records, physical inspection of property, analysis of student records, analysis of computer records, interviews with employees, etc. Despite the fact that the affiant in *Teeven* listed a number of sources that were relied upon, the Court found the affidavit **"regrettably deficient."** *Id* at 25 (**Emphasis Added**). The Court held that the **"affiant fail[ed] to tie any of his averments to particular sources."** *Id*. The Court reasoned that some averments were probably based on a review of certain computer records, but "the Court cannot guess, however, which sources enabled the affiant to make the averments alleging the Defendants', or

9

a specific Defendant's, involvement in the activities." *Id.* The Court went on to explain that **"in several instances, the affiant states a conclusion without providing any basis for such conclusion, let alone a basis that would enable the court to determine whether the conclusion was a reasonable one."** *Id.* Further:

> Many of the averments are made 'upon information and belief'...yet the **affiant does not provide any basis for the Court to determine whether such averments are 'reliable and reasonably necessary.'** If the 'information and belief' averments are based upon employee interviews, **the affiant does not indicate how many current and former employees he interviewed, nor does he provide any other information upon which the reliability of these employees could be measured; that is, whether they may be biased.**

*Id* at 28 (**Emphasis Added**).

In the case at bar, like in *Teeven*, the affidavits submitted with the government's application state conclusions without providing any basis for same. Further, the affidavits do not indicate the sources of the information alleged, or what external information (besides personal knowledge) is being relied upon. The following quotations from the Affidavit of Steve Rinaldi illustrate the "regrettably deficient" nature of the government's submission:

1. Without stating what documents were reviewed, what witnesses were interviewed, or what "other information" was obtained, Mr. Rinaldi averred in paragraph 3: "I based this Declaration on documents that I have reviewed, witnesses I have interviewed, and other information that I have obtained in the course of this investigation as part of my official duties as a fraud investigator."

2. Without making any attempt to show which part of his affidavit is reliant upon the other affidavits, Mr. Rinaldi averred in paragraph 3: "I also rely in part for this showing on the attached Declarations from two subject matter experts, Kathleen McNamara and Rodney Crawford."

10

3.  Without stating which records were analyzed, without listing the physicians allegedly involved, and without detailing how the monetary figures were calculated, Mr. Rinaldi averred in paragraph 6: "For example, between 2003 and mid-2008, our analysis shows that Universal paid just 13 physicians all of whom were in a position to and did make lucrative referrals to it, a total of $3.3 million, and received approximately $10 million in insurance payments as a consequence of those referrals."

4.  Without stating what evidence his statement is based on, Mr. Rinaldi averred in paragraph 7: "For those physicians who wanted to bill insurance and actually wanted to use their own equipment and technician to perform the work, not Universal's, but who were prohibited from billing insurance because they lacked the qualifications required by the insurance company to perform the test, Universal simply billed the patients' insurance as if it had performed the work and returned the insurance fees to the physician, taking its cut."

5.  The affidavit cites the American Medical Association's Code of Ethics as support for the statement that "fee splitting is wrong", however the American Medical Association's Code of Ethics is not a basis upon which the United States may initiate an action, and "wrong" is not a recognized legal standard. Mr. Rinaldi's averment has nothing to do with the "probable validity of the debt", as it purports to.

6.  Similarly, the affidavit asserts that radiation is harmful to patients. (See paragraph 8). Once again, this has nothing to do with the "probable validity of the debt."

7.  Without specifying which physicians are in the "group of physicians", what specific "Medicare data" was used, or which physicians were "above the 90th percentile", Mr. Rinaldi averred in paragraph 9: "The payments that Universal made to physicians yielded a group of physicians who ordered diagnostic testing at much higher rates than their peers in comparable medical specialties. Based on a peer comparison using Medicare data, many of these physicians were above the 90th percentile in test ordering compared to their peers."

8.  Without specifying which patient allegedly provided the information, Mr. Rinaldi averred in paragraph 9: "One patient told me that Washington had ordered 'at least twenty' nuclear stress tests for him, and patients were told that these tests were 'preventative.'"

11

GIARMARCO, MULLINS & HORTON, P.C.
ATTORNEYS AND COUNSELORS AT LAW
Tenth Floor Columbia Center ▼ 101 West Big Beaver Road ▼ Troy, Michigan 48084-5280 ▼ P: (248) 457-7000 ▼ F: (248) 457-7001 ▼ www.gmhlaw.com

9. Without specifying which employee allegedly provided the information, Mr. Rinaldi averred in paragraph 9: "An employee in Washington's facility told me that Washington had a quota for such tests…".

10. Without naming the "experts", providing their supposed area of expertise, or outlining the data upon which they based their conclusions, Mr. Rinaldi averred in paragraph 9: "Our consultation with experts in this area has disclosed, for example, that if Washington ordered 15 nuclear stress tests for 67 patients at age 50, one of those 67 would develop cancer *solely* as a result of these tests."

The above list is only a partial list of the conclusory statements contained in Mr. Rinaldi's affidavit. A reading of the other affidavits submitted by the government (Rodney Crawford and Kathleen McNamara) reveal similar statements. By way of example, Rodney Crawford, without making any attempt to show the "actual value", falsely concludes Defendants Young and Universal deflated the value of certain intangible assets:

> Young and Universal also listed intangible assets – certificates of need for equipment – that are in the nature of licenses for which there is little source of market value information. Young and Universal valued those assets at $5,000 each. With no ready source of valuation information for these licenses, I was instructed to take these valuations at face value. Based on the information in the financial statements, I concluded that Universal could not afford to pay a substantial debt to the United States… Unknown to me, the certificates of need had been valued by Young and Universal at approximately 1% of their actual value.

Regarding the "amount of debt" (required to be detailed by affidavit – *See* FDCPA § 3101(c)), Steve Rinaldi makes the following averment in paragraph 13:

> From 2003-2008, we were able to document approximately 90% of the $7.8 million in Medicare monies paid to Universal as infected by payments that Universal made to

12

> approximately 179 referring physician. [sic] The False Claims Act provides for treble damages and a civil penalty of approximately $5,500 to $10,500 for each false claim that a person or entity either submits to the government or causes to be submitted to the government. 21 U.S.C. §§ 3729-3733, see 31 U.S.C. § 3729(a)(1) (adjusted for inflation under the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note; Public Law 104-410). As explained above, claims submitted to Medicare that are infected by a kickback arrangement and claims for payment for tests that have not been appropriately supervised are not payable. Conservatively counting the claims at the lowest penalty end just through 2008, Universal owes the United States $21 million in treble damages and $127.5 million in civil penalties for a total of $148.5 million.

Mr. Rinaldi makes absolutely no attempt to particularize (as required by statute): (1) where the information regarding the 2003-2008 data was obtained; (2) how the $21 million in treble damages was calculated; or (3) how the $127.5 million in civil penalties was calculated (other than stating he utilized "the lowest penalty end"). In other words, no attempt is made to quantify the number of "false claims" that are alleged to have been submitted.

It is clear that the affidavits do not establish with particularity the facts supporting the probable validity of the government's claim, or the amount of the debt. Therefore, the government failed to comply with the statutory requirements for obtaining prejudgment remedies and the remedies provided should be quashed as to these Defendants. See FDCPA §§ 3101(c) and 3101(d)(2).

**C.    Failure to Satisfy Requirements as to MRI Leasing, LLC**

In addition to the foregoing, the government's application and affidavits are deficient as to MRI Leasing, LLC, because they do not establish the "probable validity of the claim for a debt". See FDCPA § 3101(c)(1).

13

Mr. Rinaldi's affidavit states that MRI Leasing, LLC is a "shell company" that has no independent existence from Universal Imaging, Inc. It seems that it is under this basis that the government erroneously seeks to hold MRI Leasing, LLC liable for the allegedly false claims submitted by Universal Imaging, Inc. The statements regarding MRI Leasing, LLC's status as a "shell company" are patently false. MRI Leasing, LLC is a thriving business wholly independent of Universal Imaging, Inc. The government has provided no credible evidence to the contrary.

MRI Leasing, LLC was formed on 04/18/02. Generally, the company purchases imaging equipment such as MRI units, and leases them to healthcare entities. The company currently has **10 employees**, only one of which is Phillip Young. There are currently **several contracts in place for the leasing of imaging equipment**, only one of which is with Universal Imaging, Inc. MRI Leasing, LLC's tax documentation further reflects the independent and successful nature of the company. For example, in 2009, the company reported Gross Receipts on its Michigan Business Tax Return in excess of $5.6 million, and in 2010, Gross Receipts were in excess of $3.5 million.

*All of the above information (and documentation reflecting the information) was provided to the government **prior** to the government filing its ex parte Application for prejudgment remedies. Instead of informing the Court of the true status of MRI Leasing, LLC, the government represented to this Court that MRI Leasing, LLC was a "shell" corporation.*

Since MRI Leasing, LLC is clearly not a "shell" company, the government cannot establish the "probable validity of the claim for a debt" as to MRI Leasing, LLC.

14

See FDCPA § 3101(c)(1). Therefore, the prejudgment remedies should be quashed as to MRI Leasing, LLC.

### III. There is No Risk to the United States that if the Prejudgment Remedies are Quashed, the United States Will be Prejudiced

As was previously indicated, the FDCPA, in § 3101(d)(2), allows the existence of any ground set forth in subsection (b) of § 3101 to be ruled upon at the hearing on a Motion to Quash. FDCPA § 3101(b) provides that a prejudgment remedy may be granted if the United States "shows reasonable cause to believe that" the debtor:

> (A) is about to leave the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States in its effort to recover a debt;
>
> (B) has or is about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States;
>
> (C) has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States; or
>
> (D) has evaded service of process by concealing himself or has temporarily withdrawn from the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States...

#### A. No Cause to Believe Debtor Will Leave the Jurisdiction of the United States

The United States presented no evidence, because no evidence exists to present, that any of Defendants are "about to leave the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States in its effort to recover a debt." 28 U.S.C. § 3101(b)(1)(A).

15

### B. No Cause to Believe Debtor Will Assign, Dispose, Remove, Conceal, Ill Treate, Waste, or Destroy Property

The application of the United States only alleged there was reasonable cause to believe that Defendants Young and Lauhoff were at risk of disposing property. Section D of its application (titled "reasonable cause to believe that debtors are disposing of property") states:

> The United States has reasonable cause to believe that each of the following debtors, Phillip J. Young, 100% owner of Universal Imaging, Inc. and MRI Leasing LLC, and Mark Lauhoff, former owner of Universal Imaging, Inc. and MRI Leasing LLC, 'has or is about to [] dispose, remove, [or] conceal" property "with the effect of hindering, delaying, or defrauding the United States,' 28 U.S.C. §§ 3101(c)(2)(B); 3101 (b)(1)(B), and that each 'has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States.' 28 U.S.C. § 3101(b)(1)(C).

Following that conclusory statement, applicable only to Young and Lauhoff, and in a demonstration of circular logic, the United States alleged that Defendants Universal Imaging, Inc., MRI Leasing LLC and Young plan to liquidate certain assets by selling them to North Oakland North Macomb Imaging, Inc. This was used as evidence to support the notion that there was risk to the United States.[4] **The United States then asked that the proposed sale be permitted.**

The United States did not, and cannot, show that the debtor "has or is about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States." See FDCPA § 3101(b)(1)(B).

---

[4] This assertion in and of itself is incredible. The United States only learned of the sale because Defendants were forthcoming and voluntarily disclosed the sale to the United States. Absolutely no danger existed or exists that Defendants would "distribute the assets beyond the reach of the United States." See Application, page 5. *In fact, when Defendants voluntarily disclosed the sale to the United States, Defendants offered to place the proceeds of the sale into an escrow account.*

### C. No Cause to Believe that Debtor Will Convert Property into Money, Securities, or Evidence of Debt in a Manner Prejudicial to the United States

As stated above, Defendants have cooperated with the government for the past five years in order to obtain a resolution of the issues forming the basis of the government's complaint. To date, nearly 15,000 pages of documents[5] have been voluntarily provided to the United States in connection with this action. As indicated, after informing the government of the proposed sale between Universal Imaging, Inc. and North Oakland North Macomb Imaging, Defendants offered to place the proceeds of same in an escrow account. There has been no indication that any actions taken or planned to be taken by Defendants would have "the effect of hindering, delaying, or defrauding the United States."

### D. No Cause to Believe that Debtor Has Evaded Service of Process

The United States presented no evidence, because no evidence exists to present, that any of Defendants have "evaded service of process by concealing himself" or withdrawing "from the jurisdiction of the United States with the effect of hindering, delaying, or defrauding the United States". 28 U.S.C. § 3101(b)(1)(D).

### CONCLUSION

The government has failed to comply with the requirements of the FDCPA. If the Court does not quash the prejudgment remedies, MRI Leasing, LLC will be forced to dissolve or file for bankruptcy. This will serve to benefit nobody, including the government, not to mention the employees of the company that will lose their jobs. Accordingly, Defendants request the following relief:

---

[5] Documents submitted to the government include financial records, general ledgers, bank statements, income tax returns, contracts for customer services, and payroll records.

1. That the prejudgment remedies awarded to the government be quashed.

2. That notification that the prejudgment remedies were quashed be sent to each and every creditor or garnishee notified of the prejudgment remedies.

3. Defendants would also not object to a third party attorney or Magistrate reviewing all business transactions on a regular basis to show that the assets of the Defendant Companies will not be dissipated.

/s/ Ben M. Gonek
Ben M. Gonek (P43716)
Giarmarco, Mullins, & Horton, P.C.
Attorney for Defendants
101 West Big Beaver, 10th Floor
Troy, Michigan 48084
(248) 457-7152
bgonek@gmhlaw.com
P43716

Dated: February 14, 2012

### CERTIFICATE OF SERVICE

BEN M. GONEK hereby states that on the 14th day of February, he caused the foregoing Motion and Brief to be filed electronically with the United States District Court and that copies of said motion and brief were forwarded to all counsel of record using the ecf system.

/s/ Ben M. Gonek