## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,   )
ex rel.. RICHARD CHESBROUGH, M.D., )
and KIM CHESBROUGH,    )
           )  Case No.: 5:06-cv-15638
      Plaintiffs,  )
vs.           )
           )  Hon. John Corbett O'Meara
UNIVERSAL IMAGING, INC.,   )
MRI LEASING, LLC, d/b/a PREMIER )
LEASING AND MANAGEMENT  )
SERVICES, LLC, PHILLIP J. YOUNG, )
MARK LAUHOFF, and GWENDOLYN )
WASHINGTON, Jointly and Severally, )
           )
      Defendants,  )
           )
and          )
           )
TCF BANK, TCF INVESTMENTS,  )
JP MORGAN CHASE, FIFTH THIRD BANK, )
CHASE BANK, COMERICA BANK,  )
GREGORY SCHWARTZ & CO. INC.,  )
           )
      Garnishees.  )
_____)

## OPPOSITION OF THE UNITED STATES TO
## DEFENDANTS' MOTION TO QUASH PREJUDGMENT REMEDIES

On December 28, 2011, this Court granted the United States' motion for prejudgment

garnishments and other remedies under the Federal Debt Collection Procedures Act, 28 U.S.C.

§§ 3101-3105, Doc. 28.  The United States now requests that the Court deny the defendants'

motion to quash those remedies.  The government previously submitted to the Court thirty-five

pages of factual declarations in which we laid out a massive fraud on the federal Medicare

program by Universal Imaging, its current and former owners Phillip Young and Mark Lauhoff,

and Phillip Young's alter ego company, MRI Leasing LLC.  Following review of this material,

this Court found that the United States had met its initial burden to establish to the Court's satisfaction facts supporting "the probable validity of the claim for a debt" as to all of these defendants.  28 U.S.C. § 3101(c)(1).

The statute now shifts the burden to the defendants affirmatively to show that the debt is *not* probably valid.  28 U.S.C. § 3101(d); *U.S. v. Teeven*, 862 F. Supp. 1200, 1211 (D. Del. 1992).  The Court will search in vain through defendants' motion to quash, however, for any argument that defendants do not owe a debt to the United States.  Moreover, the fact that this debt is far more substantial than the tiny fraction of the debt that the United States has now managed to restrain --  accounts containing less than 1% of the defendants' debt -- remains undisputed.

The defendants have had more than six weeks from the date of the Court's prejudgment remedies Order to file this motion.  The lack of any argument on the merits thus cannot be attributed to a foreshortened briefing schedule.  To the extent that the defendants are waiting for their reply brief to raise new arguments, the Court should strike any such arguments.  *Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 682-83 (E.D. Mich. 2002) (in the context of a substantive pleading "it is not the office of a reply brief to raise issues for the first time").

Rather than addressing the merits of the government's claim, defendants argue that the Court erroneously granted the remedy because the three lengthy declarations submitted by the government are not sufficiently specific.  They further argue that the government has alternative remedies that the defendants offered to it that could protect its interests.  As to the first argument, the defendants' only legal support is an unpublished Delaware district court decision in the *Teeven* matter, *supra*, a decision that was reconsidered in the published opinion cited above,

2

which approved the government's affidavits and writs *nunc pro tunc.* The defendants strangely

omit any reference to that published opinion reaffirming the prejudgment remedy. As explained

in the published *Teeven* decision, the government is not required to identify every witness it

spoke to and every document it reviewed in order to obtain a prejudgment remedy, nor does it

have to try its case at the outset in order to obtain such a remedy. As to the second argument –

the alleged availability of alternative remedies -- the statements of counsel relating to the

supposedly proffered alternatives and the defendants' alleged cooperation with the government

are unfortunately less than candid.

<u>**ARGUMENT**</u>

I.      **The Government's Declarations Establish the Probable Validity of the Debt**

The declarations provided by the government detail multiple, independent, schemes in

which the defendants were involved to defraud the United States and the federal Medicare

program. We refer the Court to those declarations, specifically the Declarations of Steve Rinaldi

and of Kathleen McNamara, attached to Document 27. Defendants take the declarants to task for

not itemizing every document they reviewed, disclosing every witness they interviewed, and

setting forth exactly what information they obtained from which sources. Doc. 44, at 10. The

published *Teeven* decision specifically finds that the Federal Debt Collection Procedures Act

does not require the government to prove up every fact in support of its claims at this beginning

stage of the litigation. On the contrary, this proceeding "is not intended to be a trial on the

merits," 862 F. Supp. at 1211, and it is also not a summary judgment proceeding. The

government needs to show only the "probable validity" of the debt; it does not have to prove its

entire case witness by witness and document by document on the day that it files it.

3

Moreover, although the declarations here are stated to be either on personal knowledge or based on specific information obtained through the investigation, the statute allows the government far greater leeway in stating its debt; the government's proof, unlike the declarations submitted here, could have been made solely on "information and belief" and still have been deemed sufficient to support the remedy.  28 U.S.C. § 3006.

It must also be noted that most of the allegations that defendants are challenging come from their own books:  the kickback amounts paid to physicians, the reimbursement received as a result of claims arising out of those kickback arrangements, the total reimbursement Universal received from Medicare, and the total claims that were infected by a kickback arrangement.  All of this information was produced to us from Universal.  If defendants actually disagreed with the numbers, it was wholly within their power to challenge any of these statements or calculations. Defendants say, "Mr. Rinaldi makes absolutely no attempt to particularize *** where the information regarding the 2003-2008 data was obtained; how the $21 million in treble damages was calculated; or how the $127.5 million in civil penalties was calculated."  Doc. 44, at 13.  Of course the information as to the 2003-2008 data comes from Universal's own books and records, the $21 million is three times the 90% of $7.8 million in Medicare payments that were infected by kickback arrangements, the $127.5 million in civil penalties is the total number of false claim lines represented by the 90% of $7.8 million submitted to Medicare times the lowest penalty amount of $5500.  All of these claims are documented in Universal's books.  If any of this information were inaccurate, Universal would be uniquely situated to tell the Court so.  The fact that it is unable to challenge a single number or a single fact highlights the entirely theoretical nature of its argument and demonstrates that it should be rejected.

II.    **The Government Has Established the Probable Validity of the Debt as to MRI Leasing**

The government submitted a declaration from a forensic accountant who has examined the financial relationship between Universal Imaging, Inc. and MRI Leasing LLC. That declaration lays out in detail the evidence that their relationship is "not consistent with any arms-length dealing between independent corporations." Doc. 27, p. 31 of 42, ¶ 7(B). The forensic accountant also spells out in detail the "substantial evidence that the corporate form is being used by the primary shareholder" and owner, Phillip Young, "as a facade for operations that will profit his other for-profit ventures and himself personally," as well as the "substantial evidence" that the two companies are alter egos of Young under the standards set forth by *U.S. v. Walton*, 909 F.2d 915, 918 (6th Cir. 1990). *Id.* at ¶ 10, citing *id.* at ¶ 6. Defendants do not make any attempt to rebut the government's substantial sworn factual showing that MRI Leasing is the alter ego of Young. It is true that, as defendants say (Doc. 44, at 14), MRI Leasing "was formed in" 2002, *i.e.*, incorporated then. But like many other entities incorporated by Young at various times that never became operational, MRI Leasing had no activity on its books until 2006. In that year MRI Leasing became active in order to allow the owner of Universal to continue to siphon profit from Universal even though Universal had been reincorporated as a nonprofit. At that point, all of Universal's valuable transferable assets, specifically its diagnostic testing equipment and mobile trailers, were transferred to MRI Leasing for no consideration other than some temporary debt service. Universal, which originally paid for its equipment, paid for it a second time when it repaid a bank loan in 2011 from TCF Bank that MRI Leasing had supposedly taken out to "purchase" the equipment. Not only did Universal *de facto* pay for its own equipment twice, it paid rent for its own equipment to MRI Leasing, which was the mechanism used to transfer

5

profits out of the "non-profit" Universal.  In fact, Universal has been MRI Leasing's most substantial source of revenue since 2006.

Defendants claim that MRI Leasing is "independent" of Universal and "successful," writing that MRI Leasing "reported Gross Receipts on its Michigan Business Tax Return in excess of $5.6 million, and in 2010, Gross Receipts were in excess of $3.5 million."  (Doc. 44, at 14).  Counsel for the defendants has mistakenly provided the Court with the total gross receipts for the *combination* of Universal, MRI Leasing and a third company owned by Young; these entities file one single tax return because they are under common control.  MRI Leasing's separate gross receipts bear no relation to these numbers, and thus, even defense counsel has confused these entities and evaluated them as a single unit.

In fact, Universal is responsible for the majority of the revenue actually reported by MRI Leasing on its tax returns; indeed, virtually all of MRI Leasing's income flows from Universal, directly or indirectly.  The two most significant contracts that MRI Leasing has with third party customers were originally Universal's contracts, and were transferred from Universal to MRI Leasing for no consideration.  Thus in 2009, for example, 96% of MRI Leasing's revenue came from a combination of payments from Universal and payments from two customers of Universal whose contracts were moved to MRI Leasing for no consideration.  Similarly, while defendants say that MRI Leasing "currently has 10 employees, only one of which is Phillip Young," Doc. 44, at 14, they neglect to mention that seven of these employees were recently transferred there from Universal, MRI Leasing formerly having no employees because it had no real independent existence other than as a conduit to remove for-profit operations from Universal.  (In fact, these employees are leased from a staffing company called Costaff and were not actually employed by

Universal or MRI Leasing LLC; the Costaff contracts were simply moved from Universal to MRI Leasing).[1]

In sum, MRI Leasing and Universal are properly considered one single entity for purposes of the debt to the United States, and the United States' prejudgment remedy properly runs against MRI Leasing, which now has possession of virtually all of Universal's assets.

III.   **The Application is "Under Oath" As Required by the Statute**

The Federal Debt Collection Procedures Act requires that "[t]he United States," when it is seeking a prejudgment remedy under the Act, "make application under oath" for such a remedy.  28 U.S.C. § 3101(a)(1).  The definition of the "application" is a pleading that contains "the factual and legal basis for each prejudgment remedy sought," § 3101(a)(2), and that also "include[s] an affidavit establishing with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover."  28 U.S.C. § 3101(c)(1).  Defendants argue that the statutory requirement that "the United States" must provide an oath in connection with the application, means that *counsel* for the United States has to swear to the facts contained in the application, whether or not she has personal knowledge of the facts, in addition to the oaths of the actual affiants with personal knowledge that make up the application. As the comment to Rule 3.3 of the Michigan Rules of Professional Conduct makes clear, while government counsel, like all advocates, is responsible for the assertions in all pleadings and other documents prepared for litigation under Rule 11, s/he "is usually not

---

[1] The government will submit a supplemental declaration under oath as to the facts alleged in this paragraph if the Court so requests.  It has not done so here because the facts that it is rebutting are mere assertions of counsel in defendants' brief and thus technically should simply be disregarded by the Court since they lack any evidentiary support.

7

required to have personal knowledge of matters asserted therein, because litigation documents ordinarily present assertions by the client or by someone on the client's behalf and not assertions by the lawyer."  As in a "verified complaint," where the verification is signed by the client, not by counsel, there is no reason to believe that the Federal Debt Collection Procedures Act intended to impose a unique duty on counsel for the United States to represent facts under oath as to which she has no necessary personal knowledge.  On the contrary, the Act specifically distinguishes between "counsel for the United States," 28 U.S.C. § 3002(1)(A), and the "United States," *id.* 28 U.S.C. § 3002(15).  The first is the government's lawyer, and the second is defined as the client agency that seeks a prejudgment remedy in order to vindicate a fraud on its programs.  The statutory "oath" requirement in connection with the application applies to "[t]he United States," ***not*** to "counsel for the United States," 28 U.S.C. § 3101(a)(1).  In other words, the Act imposes an oath requirement on the client agency and its investigative agents in connection with their factual representations in the application.  It does not impose an oath requirement on counsel, and indeed any such requirement would be very peculiar.

The United States submits that it met the "oath" requirements of the Act by presenting the facts in the application under penalty of perjury through three declarants.  It further submits that, on this score, the decision by the Delaware district court in *Teeven* to impose an oath requirement on *counsel* is erroneous.  *Teeven* is of course not binding precedent on this Court. To the extent that this Court agrees with the *Teeven* interpretation of the statute, we submit an oath of counsel relating to the Application as Exhibit A to this brief, and ask that this be substituted for the initial application.  As made clear in C. Wright, A. Miller, M. Kane, R. Marcus, 5A *Federal Practice and Procedure* sec. 1339 (3rd ed. 2011), if there is such a

8

verification or oath requirement, such a requirement is not jurisdictional and can be cured *nunc pro tunc* by amendment.

IV.    **Defendants Have Not Rebutted the Government's Showing That They Have And Are Continuing To Convert Their Property Into Money or Debt and to Assign Property "With the Effect of Hindering, Delaying or Defrauding the United States"**

In addition to a showing of the probable validity of the debt, the Debt Collection Procedures Act requires the government to show that the defendants either have or are about to assign or dispose of property with the effect of hindering, delaying, or defrauding the United States, or that the defendants are converting their property into money in a manner prejudicial to the United States. 28 U.S.C. § 3101(b)(1)(B) & (C). The government made a substantial showing both through the declaration of a forensic accountant and through a declaration of its investigative agent that the defendants have engaged in a systematic effort to hide assets from the United States, to transfer their assets to third parties for no consideration, to convert their property into money, and to greatly undervalue their nontransferable assets in statements under oath. Defendants do not rebut any of this evidence other than to baldly state, with no support, that "[n]o attempts were made by Defendants to 'hide' assets or otherwise take any actions that would jeopardize the United States' recovery." Doc. 44, at 4. Following the filing of this action, the government found multiple additional instances of money and property being transferred to third parties for no consideration while defendants were ostensibly negotiating a settlement agreement with the United States. These included a transfer by Mr. Young of an interest in his companies to his wife, sale of his personal residence with a transfer of the gain to his wife, and a transfer for no consideration to two physicians of an interest in an office building that Mr. Young

9

had previously valued at several thousand dollars.[2]

In addition, the government described in the declarations made a part of its application how the sworn financial statements from the defendants showed that Universal had only one secured creditor, TCF Bank.  Within a few days of providing those sworn financial statements, the defendants caused a financing statement to be submitted through counsel to the State of Michigan providing a security interest in Universal's assets to MRI Leasing, a security interest that was never disclosed to the government.  Doc. 27, p. 22-23 of 42, ¶ 18.  The ostensible basis for the security interest was the fact that Universal supposedly owed MRI Leasing money for leasing back from MRI Leasing its own equipment.  As described above, Universal initially paid for the equipment, transferred it to MRI Leasing when Universal became a non-profit, was liable on the loan that MRI Leasing and Universal took out from TCF Bank to "pay" Universal for the equipment, and then Universal paid back that loan from the sale of its own assets.  The security interest was thus a sham.  Defendants, knowing full well that the only security interest that had been disclosed to the government related to TCF Bank, engaged in a systematic attempt to have the government commit in writing that it would not challenge a transfer of Universal's assets to *any* secured creditor, without disclosing MRI Leasing's security interest.  When government counsel sought to obtain the identity of secured creditors other than TCF Bank, the responses it received were at best misleading.  Doc. 27, p. 22-23 of 42, ¶ 18.

Defendants say that "[a]s part of the [previously proposed settlement] agreement, the government would allow for the orderly liquidation of Universal Imaging, Inc.'s assets" and that

---

[2] The government will submit a supplemental declaration under oath as to the facts alleged in this paragraph if the Court so requests.  It has not done so here for the same reasons outlined in footnote 1.

"Universal Imaging, Inc. would then be allowed to pay off its secured creditors," Doc. 44, at 4. There was indeed a draft settlement agreement with the United States.  That agreement, which was reviewed and approved by defendants, provided for a consent judgment.  It contained no language relating to secured creditors or an "orderly liquidation," but obviously, by operation of law, any legitimate secured creditors would have had priority over the government's unsecured judgment.  The systematic attempt to mislead here consisted of the defense attempt to have the government commit in writing *that it would not challenge* any transfer to *any* secured creditor, knowing full well at the time that the MRI Leasing sham security interest had never been disclosed by the defendants to the government.  The defendants withdrew from the settlement not because the government would not agree to a priority for secured creditors, which would have happened by operation of law, but because the government would not agree to refrain from challenging Universal's transfer of all remaining value in the company to MRI Leasing under a sham security interest that had never been disclosed to it.

This course of events falls well within the Act's remedy for a defendant who "has or is about to assign *** property with the effect of hindering, delaying, or defrauding the United States."

IV.    **There Is No Adequate Alternative Remedy**

Defendants argue that the government is adequately protected because (1) they have given the government notice of asset sales, (2) they have agreed to put proceeds of asset sales into an escrow account, and (3) they have cooperated.  None of these statements have any factual basis.

11

a.      *Asset sales and notice.*

In their brief, defendants state, "[d]uring the entire course of the investigation, Defendants have provided the government with notice of all major asset sales, and at no point did the government attempt to seize any assets."  Doc. 44, at 4.  This statement is puzzling, since prior to December 2011, there had never been any notice to the government by Universal of any actual asset sales or transfers. At an earlier stage of the investigation the United States learned only by happenstance that Universal intended to sell its most valuable assets, its Certificates of Need, which are State licenses to operate radiology equipment in certain areas, for $1 to another imaging company.  This asset sale was not disclosed to us by Universal.  In order to avoid legal action by the United States to protect its interest in these assets, defendants agreed to rescind this agreement and also agreed not to dispose of any assets during the pendency of the investigation.[3] In defendants' brief, this course of events has been transformed into the following statement:  "In fact, at one point during the investigation, Defendants willingly agreed not to dispose of any major assets without prior approval from the United States."  Doc. 44, at 4.

Other asset transfers that have occurred during the pendency of the investigation without notice to the government include Universal's transfer to MRI Leasing of its ownership interest in an entity that owned an MRI machine for no consideration; Mr. Young's transfer of an ownership interest in his companies to his wife for no consideration; and the transfer of a one-third interest in an office building to several physicians for no consideration.  There was no prior notice to the government of these asset sales or transfers.  At three points in their brief,

_____

[3] We can provide the representation in writing to this effect from former defense counsel if the Court so desires.

12

defendants assert that they were "forthcoming and voluntarily disclose[d]" the recent sale of assets to North Oakland North Macomb.  Doc. 44, at 16, *see id.* at n.4, and *id.* at 5.  In fact, we received no formal notice as to this sale until the afternoon of the Friday before the Christmas weekend, December 23, 2011, when we were told that the defendants intended to close on this sale seven business days later, on January 5, 2012.  As we understand from counsel for North Oakland North Macomb, notwithstanding Universal's prior agreement with us not to dispose of any assets without our approval, Universal would have gone forward with this sale without even this Christmas Eve notice to us, but for the fact that counsel for North Oakland North Macomb insisted on such notice as a condition of sale.

     b.    *The Alleged "Escrow Account Agreement"*

At three different points in their brief, defendants maintain that they offered to place the proceeds of the North Oakland North Macomb sale into escrow, and that this would have adequately protected the United States.  Doc. 44, at 5; Doc. 44, at 16 n.4; Doc. 44, at 17.  In the Rinaldi Declaration, Doc. 27, p. 24 of 42, ¶ 19, we detail how we asked defendants on three different occasions between December 13 and December 23 to confirm this offer to place the proceeds of the sale into an escrow account, and how we were promised a response that never arrived.  On December 22, defense counsel sent a letter by regular mail, which did not arrive until after the government filed its application for prejudgment remedies, in which he states, "that [escrow] proposal we submitted is withdrawn."[4]  In light of this sequence of events, the assertions in the defendants' brief as to an alleged escrow agreement providing an adequate

---

       [4] As a matter of courtesy we do not typically attach letters from counsel to briefs but we will produce a copy of this letter at the oral argument scheduled on March 22 should the Court wish to see it.

alternative remedy are completely baffling.

     c.     *The Alleged "Cooperation"*

In this case, the United States could not complete its investigation because the defendants refused to produce crucial documents voluntarily and then continued to refuse to produce them even after they were served with an investigative subpoena. The United States had to take the unusual step of moving to enforce the investigative subpoena and obtaining a court order in a miscellaneous proceeding. *U.S. v. Universal Imaging, Inc.*, Misc. No. 2:09-mc-50995 (Tarnow, J.). As stated in the Crawford Declaration attached to Doc. 27, defendants were also not cooperative in their financial disclosures: assets contained in defendants' sworn financial disclosures to the United States were egregiously undervalued. Doc. 27, p. 29 of 42, ¶ 4.

In a similar vein, defendants were not cooperative even in implementation of this Court's order dated January 6, 2012 (Doc. 35). That Order embodied an agreement between the United States and defendants Phillip Young, Universal Imaging, Inc. and MRI Leasing LLC, to delay any litigation concerning the prejudgment remedies until the parties had first had an opportunity to attempt to resolve the entire matter without further litigation, which was to be preceded by expedited asset discovery. The parties had agreed that the United States would provide a list of documents that it needed to the defendants by January 6. The Court Order stated that the defendants would provide those financial records to counsel for the United States by January 10. Defendant Phillip Young would make himself available for an asset deposition on or about January 17, following which the parties would have a week to attempt to resolve this matter before any potential motion to quash would be filed.

While the United States provided the standard financial disclosure forms to the

14

defendants and identified the specific documents that it needed on January 6 as agreed, no

documents were produced by the defendants on January 10 as required by the Court's Order.

Counsel for defendants said that documents would be delivered by January 12, but none arrived.

On January 13, counsel stated that the documents would be delivered on January 17.  We asked

for confirmation on January 14 that what was being produced were the priority documents that

we had identified, but received no response.  We asked again for confirmation on January 16 as

to what was being produced.  Once again, we received no response.  Thereafter, documents were

delivered, but two-thirds of them were something other than the priority documents the

government had requested, and most of the priority documents were missing.[5]  Moreover,

electronic files that were to be delivered in Excel were instead delivered in a proprietary format

that was not readable.  On January 18, 19 and 23, we asked once again that the data be provided

in Excel.  On January 24 a disk was provided in Excel but it did not contain the general ledger

information that we had sought.  On January 26 we provided a list of the missing priority items,

most of the priority items having as yet not been provided.  On Monday, January 30, we notified

counsel by telefaxed letter that significant items remained missing and that if the documents

were not produced by Friday, February 3, we would be forced to take the matter up with the

Court.  On February 3 we notified counsel once again that the general ledger files remained

---

[5] At multiple places in their brief defendants refer to "15,000 pages" of material that has
been provided, and in Doc. 42 filed on January 31, 2012, at p. 2 ¶ 6, they state that "Defendants
have produced over 5,000 pages of documents to the government." In neither pleading do
defendants mention that defendants chose to produce documents that were not responsive to the
priority production that the government had requested, presumably for the purpose of inflating a
page count that could be presented to this Court.

15

missing.  These files were then finally provided by email on February 3.[6]  We then immediately scheduled the asset deposition of Mr. Young, with the consent of Young's counsel, for the next week, Friday, February 10.  Late Thursday afternoon, February 9, counsel cancelled the deposition, and a few days later he filed the pending motion to quash in violation of the schedule contained in the Court order dated January 6, 2012, Doc. 35.[7]

This matter has thus been characterized throughout the investigation by a *failure* to cooperate, with the government repeatedly having to threaten to bring matters into Court in order to obtain basic documents and information.  Defendants state at four different places in their brief that they have "cooperated" and "given the government the benefit of full disclosure."  Doc. 44, at 1-2; *id.* at 4; *id.* at 5; *id.* at 17.  Unfortunately, repetition does not make it so.

### V.    The Other Factual Allegations Lack Merit

1.    Defendants attempt to cast aspersions on the merits of this case by noting on the first page of their brief that the private party relator in this case, Dr. Richard Chesbrough, filed a second *qui tam* case under the False Claims Act that was ultimately dismissed.  Of course that case involved different defendants, different facts, different counsel, and the government did not intervene in and take primary responsibility for the case, unlike this matter.  The relevance of

---

[6] This did not complete the required document production because Mr. Young failed to produce, among other things, documents justifying his transfer in 2011 for no consideration of a one-third interest in an office building that he had previously valued under oath at several hundred thousand dollars.  The United States has now subpoenaed these documents from Mr. Young as well as from the physicians to whom he states he transferred the interest.  The physicians have to date declined to produce most of the subpoenaed documents.  This is another matter that the United States may have to bring before the Court.

[7] The United States will provide the email correspondence that documents each of the events outlined in this paragraph if the Court wishes to review it.  Ultimately Mr. Young did appear for an asset deposition on March 1.

this, other than to try to paint Dr. Chesbrough in a bad light, is difficult to discern.

2.     Defendants raise the specter of bankruptcy:  "If the Court does not quash the prejudgment remedies, MRI Leasing, LLC will be forced to dissolve or file for bankruptcy.  This will serve to benefit nobody, including the government, not to mention the employees of the company that will lose their jobs."  Doc. 44, at 17.  As stated above, MRI Leasing has no employees; it leases employees from a staffing company.  Moreover, the government has a total of $65,000 in assets of MRI Leasing restrained.  This will not bankrupt MRI Leasing.

### CONCLUSION

For all of the above reasons, this Court should DENY the motion to quash, and should STRIKE any new arguments raised for the first time in any reply brief.

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney


s/Joan E. Hartman
By:     JOAN E. HARTMAN
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9190
joan.hartman@usdoj.gov

Dated:  March 9, 2012

17

# ATTACHMENT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,              )
ex rel. RICHARD CHESBROUGH, M.D.,      )       **FILED IN CAMERA**
and KIM CHESBROUGH,                    )
                                       )
              Plaintiffs,              )
                                       )
vs.                                    )       CIV. No. 5:06-cv-15638-JCO-VMM
                                       )       HON.   JOHN CORBETT O'MEARA
                                       )       MAG. JUDGE VIRGINIA M. MORGAN
                                       )
UNIVERSAL IMAGING, INC.,               )
MRI LEASING, LLC, d/b/a PREMIER        )
LEASING AND MANAGEMENT                 )
SERVICES, LLC, PHILLIP J. YOUNG,       )
MARK LAUHOFF, and GWENDOLYN            )
WASHINGTON, Jointly and Severally,     )
                                       )
              Defendants,              )
                                       )
and                                    )
                                       )
TCF BANK,                              )
TCF INVESTMENTS,                       )
JP MORGAN CHASE,                       )
FIFTH THIRD BANK,                      )
CHASE BANK,                            )
COMERICA BANK,                         )
GREGORY SCHWARTZ & CO. INC.            )
                                       )
              Garnishees.              )
_____)

**APPLICATION IN CAMERA OF THE UNITED STATES UNDER THE FEDERAL
DEBT COLLECTION PROCEDURES ACT FOR PRE-JUDGMENT GARNISHMENTS
AND OTHER REMEDIES**

The United States, plaintiff in this action, applies to this Court for pre-judgment

garnishments pursuant to sections 3101 and 3104 of the Federal Debt Collection Procedures Act of

1990, 28 U.S.C. §§ 3001-3308 and for other prejudgment remedies to ensure that the proceeds of a

sale of assets of the debtor Universal Imaging, Inc. scheduled on January 5, 2012 will not be dissipated pending the outcome of this litigation pursuant to the authority set forth in 28 U.S.C. § 3003(c)(7).   This Court has jurisdiction over this application under 28 U.S.C. § 3101(a) and § 1345.   The pre-judgment remedies provisions of the Federal Debt Collection Procedures Act provide that the Court shall freeze assets in place upon an application of the United States that meets the requirements of that Act so that the assets will not be dissipated, while simultaneously providing the defendants with notice at the time the remedy is put into effect and affording the defendants an opportunity for an expedited hearing so that they are not prejudiced.

The Federal Debt Collection Procedures Act states that in conjunction with a complaint on a claim for a debt, the United States may "make application under oath to a court to issue any prejudgment remedy," 28 U.S.C. § 3101(a), including garnishments of property in the control of third parties, § 3104.   The purpose of the pre-judgment remedy is to establish "security for such judgment (and interest and costs) as the United States may recover on a claim for a debt."   28 U.S.C. § 3102(b); § 3105(a).   Any assets of the debtor are available for a prejudgment remedy if the statutory requirements are met; there is no tracing requirement.   The statute provides that if the United States makes the requisite statutory showing to obtain a prejudgment remedy, the Court "shall issue all process sufficient to put into effect the prejudgment remedy sought."   28 U.S.C. § 3101(e).

Because the debtors have not yet been served with any complaint and are therefore not yet parties, and in order to ensure that assets are not further dissipated once a debtor knows that the United States has sought such a remedy but not yet implemented it, the request for a prejudgment remedy is an ex parte proceeding; the United States serves a copy of this application and the order granting prejudgment remedies on the defendants at the time that the prejudgment remedy *is put*

2

*into effect*.  28 U.S.C. § 3004(c).   The defendants who are now named in the complaint are at the same time provided with statutory notice that explains their rights to move to quash the remedy, to obtain a hearing should they move to quash, and the legal bases upon which they may move to quash.   28 U.S.C. § 3101(d).

In support of the application for a pre-judgment remedy, the United States must file an affidavit, 28 U.S.C. §   3101(c), for which it may substitute a declaration, *see* 28 U.S.C. § 1746, "establishing with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application." *Id.* § 3101(c)(1)(a). The affidavit "may be made on information and belief." *Id.* § 3006. The affidavit shall state as follows:

a.   "the amount of the debt claimed," § 3101(c)(2)(A);

b.   that the United States has reasonable cause to believe that the debtor "has or is about to assign, dispose, remove [or] conceal * * * property with the effect of hindering, delaying, or defrauding the United States," 28 U.S.C. §§ 3101(c)(2)(B); 3101(b)(1)(B); or alternatively that the United States has reasonable cause to believe that the debtor "has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States." 28 U.S.C. § 3101(b)(1)(C).

c.   that following issuance of the writ(s), the debtor will be afforded an opportunity for a hearing. 28 U.S.C. § 3101(a)(3)(A).

All statutory requirements for issuance of the pre-judgment remedies set forth in 28 U.S.C. §§ 3101 and 3104 have been satisfied in this case.   The attached declaration of United States Department of Health and Human Services Special Agent Steve Rinaldi, which references the

3

attached declarations from subject matter experts Kathleen McNamara and Rodney L. Crawford,

establishes the basis for prejudgment garnishments and other remedies sought in this case.

A.   AMOUNT OF THE DEBT

     1.     As set forth in the attached declaration of Special Agent Steven Rinaldi, the

defendants participated in several large scale frauds on the Medicare system, and the amount of the

False Claims Act debt in this case is at least $ 148.5 million.

B.   BASIS OF THE ACTION

     2.     The Federal Debt Collection Procedures Act allows pre-judgment remedies to be

used in tort and contract cases and actions seeking to recovery a penalty.   28 U.S.C. §§ 3102(b);

3105(b).   The action set forth in the separate complaint which will be filed today electronically (a

copy of which is attached to this pleading) is all of these, and therefore the remedy of prejudgment

garnishment is available under these circumstances. The False Claims Act counts of the complaint

embody both "an action to recover a * * * penalty," and "an action against the debtor for damages

in tort."   False Claims Act treble damages and penalties constitute a claim for a "debt" as defined

by the Federal Debt Collection Procedures Act. *U.S. ex rel. Doe v. DeGregorio,* 510 F. Supp. 2d

877, 884 (M.D. Fla. 2007); *United States v. Teeven*, 862 F. Supp. 1200, 1225 (D. Del. 1992). The

claim in the complaint for unjust enrichment is also a "debt," because it is "on a contract, express or

implied" that "is not fully secured by real or personal property."   28 U.S.C. §§ 3102(b); 3105(b).

C.   FACTS SUPPORTING THE PROBABLE VALIDITY OF THE CLAIM

     3.     The facts supporting the probable validity of the United States' claim in this case

are set forth in detail in the attached declaration of Special Agent Steve Rinaldi and the McNamara

and Crawford declarations that it refers to that are attached.

D.   REASONABLE CAUSE TO BELIEVE THAT DEBTORS ARE DISPOSING OF

4

PROPERTY

4.      The United States has reasonable cause to believe that each of the following debtors, Phillip J. Young, 100% owner of Universal Imaging, Inc. and MRI Leasing LLC, and Mark Lauhoff, former owner of Universal Imaging, Inc. and MRI Leasing LLC, "has or is about to [] dispose, remove, [or] conceal" property "with the effect of hindering, delaying, or defrauding the United States," 28 U.S.C. §§ 3101(c)(2)(B); 3101(b)(1)(B), and that each "has or is about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States." 28 U.S.C. § 3101(b)(1)(C).

As set forth in the declaration of Steve Rinaldi referencing the attached declaration of Rodney Crawford, the United States was informed by counsel for Universal Imaging, Inc. on the afternoon of Friday December 23, 2011, that defendants Universal Imaging, Inc. and MRI Leasing LLC and their 100% owner Phillip J. Young will sell Universal's major asset to a third party, North Oakland North Macomb Imaging, Inc., on January 5, 2012, and will thereafter distribute the proceeds.   While the United States was finalizing what it understood were agreed-upon settlements in this case with all of these parties and awaiting their signatures on the settlement documents, Young and Universal were deciding to repudiate the settlement and liquidate Universal, providing notice of such sale only on the Friday afternoon before this Christmas weekend, and then to distribute the assets beyond the reach of the United States. Without orders in place preventing the further disbursement of these funds as these entities are liquidated, these parties are likely to place any assets beyond reach.   Similarly, while the United States had a settlement in principle with defendant Mark Lauhoff through his counsel, his counsel informed us last week that does not return his calls, and we have not been able to obtain his signature on any

5

agreement.

The United States therefore seeks an order directing that no funds may be disbursed from the sale of assets of Universal Imaging, Inc. or MRI Leasing LLC to North Oakland North Macomb Imaging, Inc. other than a disbursement to TCF Bank to pay secured debt, and that the remaining funds shall be paid to the Clerk of Court under an order to be prepared by the United States and approved in advance by the Clerk of Court pursuant to Local Rule 67.1. If the defendants prevail in the litigation the funds shall be released. The United States does not seek to interfere in the sale to North Oakland North Macomb Imaging and therefore has not sought a garnishment or sequestration order directed to that entity.

The proposed order also provides that any future asset sales shall not take place without at least 10 days' notice to the United States and a demonstration by the debtor that such sale is fair market value, and all proceeds of any such sales shall similarly be paid to the Clerk of the Court and placed in the court's registry pending the outcome of this litigation.

The United States also seeks to garnish these bank accounts and/or investment accounts belonging to co-conspirators to whom millions of dollars in wrongfully obtained Medicare funds have been transferred, including the two corporate entities and the current and former owners, Phillip J. Young and Mark Lauhoff.   As to their personal assets, while engaging in these sham settlement negotiations, both defendants Phillip J. Young and Mark Lauhoff had real property that was sold in 2011 and Mark Lauhoff has had other real property titled to him listed for sale.    If there were proceeds from these sales beyond debt due to lenders, the United States is unaware of their whereabouts.

E.  NO BOND REQUIRED

5.    No bond is required of the United States.   28 U.S.C. § 3101(c)(3).

6

G.   APPOINTMENT OF SPECIAL PROCESS SERVERS

6.     The Federal Debt Collection Procedures Act states that, except as otherwise provided, "the Federal Rules of Civil Procedure shall apply with respect to actions and proceedings under this chapter." Federal Rule of Civil Procedure 4(c) provides that this Court may appoint a special process server. The United States respectfully requests that this Court appoint Steve Rinaldi, Special Agent, Office of Inspector General, Department of Health and Human Services, and Jonathan Sonbay, Health Care Fraud Investigator, Office of the United States Attorney, Eastern District of Michigan, as special process servers to effectuate the prejudgment remedies set forth in the proposed Writ. The proposed Writ so provides.

Respectfully submitted,

BARBARA L. McQUADE
United States Attorney

s/Joan E. Hartman_____
JOAN E. HARTMAN
Assistant United States Attorney
211 W. Fort St. Room 2001
Detroit, MI 48226
(313) 226-9190

December 27, 2011

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

s/Joan E. Hartman_____
JOAN E. HARTMAN
Assistant United States Attorney

7